*Solicitation Version*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| QUOTIENT LIMITED,[1] | ) Case No. 23-90003 (DRJ) |
| | ) |
| Debtor. | ) |
| | ) |

## PREPACKAGED CHAPTER 11 PLAN OF
## REORGANIZATION OF QUOTIENT LIMITED

---

[1]   The Debtor is a public no par value limited liability company incorporated in Jersey, Channel Islands, with registered number 109886.  The Debtor's registered address is Quotient Limited, 28 Esplanade, St Helier, JE2 3QA, Jersey, Channel Islands.

**PAUL HASTINGS LLP**
James T. Grogan III (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Matt Murphy (*pro hac vice* admission pending)
Matthew Micheli (*pro hac vice* admission pending)
Michael Jones (*pro hac vice* admission pending)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: mattmurphy@paulhastings.com
        mattmicheli@paulhastings.com
        michaeljones@paulhastings.com

-and-

Jayme Goldstein (*pro hac vice* admission pending)
Christopher Guhin (*pro hac vice* admission pending)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: jaymegoldstein@paulhastings.com
        chrisguhin@paulhastings.com

*Proposed Counsel to the Debtor and Debtor in Possession*

# TABLE OF CONTENTS

PAGE

ARTICLE I : DEFINED TERMS AND RULES OF INTERPRETATION ................................... 1

ARTICLE II : TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
PRIORITY TAX CLAIMS ...................................................................................... 13

    2.1.    Administrative Expense Claims ................................................................ 13
    2.2.    Professional Fee Claims ........................................................................... 14
    2.3.    Priority Tax Claims ................................................................................... 14
    2.4.    Post-Effective Date Fees and Expenses ................................................... 15

ARTICLE III : CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ................................................................................................... 15

    3.1.    Summary of Classification and Treatment of Classified Claims and
Interests .................................................................................................... 15
    3.2.    Treatment of Claims Against and Interests in the Debtor ........................ 16

ARTICLE IV : ACCEPTANCE OR REJECTION OF THE PLAN ........................................... 21

    4.1.    Impaired Classes of Claims Entitled to Vote on this Plan ...................... 21
    4.2.    Acceptance by an Impaired Class of Claims ........................................... 21
    4.3.    Presumed Acceptance by Unimpaired Classes ....................................... 21
    4.4.    Presumed Rejection by Certain Impaired Classes .................................. 21
    4.5.    Reservation of Rights ............................................................................... 21

ARTICLE V : MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 21

    5.1.    Restructuring Transactions ...................................................................... 21
    5.2.    Operations between the Confirmation Date and Effective Date ............. 22
    5.3.    Operations between the Effective Date and Merger Date ....................... 22
    5.4.    Sources of Cash Consideration for Plan Distributions ........................... 22
    5.5.    Additional Quotient Limited Common Equity and Newco Partnership
Interests .................................................................................................... 22
    5.6.    Section 1145 Exemption .......................................................................... 22
    5.7.    Finance Co Notes ..................................................................................... 23
    5.8.    Corporate Governance, Directors, Officers, and Corporate Action ........ 23
    5.9.    Continued Corporate Existence ............................................................... 24
    5.10.    Cancelation of Liens; Surrender and Cancelation of Notes, Instruments,
Certificates, and Other Documents Evidencing Claims .......................... 24
    5.11.    Reporting Company Requirements ........................................................... 26
    5.12.    Existing Subsidiary Interests ................................................................... 26
    5.13.    Additional Transactions Authorized under This Plan .............................. 26
    5.14.    Management Incentive Plan ...................................................................... 26
    5.15.    Comprehensive Settlement of Claims and Controversies ....................... 26

5.16.    Debtor's Waiver and Release of Claims Against Holders of Interests in the
Debtor ................................................................................................................ 27

ARTICLE VI : TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED
LEASES, AND INSURANCE POLICIES ................................................................ 28

6.1.    Assumption or Rejection of Executory Contracts and Unexpired Leases ........... 28
6.2.    Cure Obligations ................................................................................................ 28
6.3.    Insurance Policies and Agreements .................................................................... 29
6.4.    Existing Compensation and Benefit Plans .......................................................... 29
6.5.    Postpetition Contracts and Leases ...................................................................... 29
6.6.    Modifications, Amendments, Supplements, Restatements, or Other
Agreements ........................................................................................................ 29
6.7.    Nonoccurrence of Effective Date ........................................................................ 30

ARTICLE VII : PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 30

7.1.    Timing and Calculation of Amounts to Be Distributed ...................................... 30
7.2.    Special Rules for Distributions to Holders of Disputed Claims .......................... 30
7.3.    Means of Cash Payment ..................................................................................... 30
7.4.    Minimum; De Minimis Distributions .................................................................. 30
7.5.    Withholding and Reporting Requirements .......................................................... 31
7.6.    Compliance Matters ........................................................................................... 31
7.7.    Setoff and Recoupment ...................................................................................... 31
7.8.    Reinstated Claims .............................................................................................. 31
7.9.    Undeliverable or Non-Negotiated Distributions and Unclaimed Property .......... 31
7.10.   Claims Paid by Third Parties ............................................................................. 32
7.11.   Applicability of Insurance Policies ..................................................................... 32
7.12.   Allocations ......................................................................................................... 32

ARTICLE VIII : PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS ....................................................... 32

8.1.    Disputed Claims Process .................................................................................... 32
8.2.    Allowance of Claims .......................................................................................... 33
8.3.    Claims Administration Responsibilities ............................................................. 33
8.4.    Disallowance of Claims ..................................................................................... 33

ARTICLE IX : CONFIRMATION AND CONSUMMATION OF THE PLAN ......................... 33

9.1.    Conditions to Effective Date .............................................................................. 33
9.2.    Waiver of Conditions ......................................................................................... 34
9.3.    Vacatur of Confirmation Order .......................................................................... 34
9.4.    Notice of Effective Date ..................................................................................... 34

ARTICLE X : EFFECT OF PLAN CONFIRMATION ............................................................. 34

10.1.   Binding Effect .................................................................................................... 34

10.2.   Discharge ................................................................................................ 34
10.3.   **Release of Liens** ................................................................................... 36
10.4.   **Releases by the Debtor** ........................................................................ 36
10.5.   **Releases by Holders of Claims and Interests** .................................... 37
10.6.   **Exculpation** ......................................................................................... 38
10.7.   **Injunctions Related to Exculpation and Releases** ............................ 38
10.8.   Survival of Indemnification and Exculpation Obligations ................. 40
10.9.   Term of Bankruptcy Injunction or Stays .......................................... 40
10.10.  Liability to Governmental Units ...................................................... 40

ARTICLE XI : RETENTION OF JURISDICTION ..................................................... 40

11.1.   Retention of Jurisdiction .................................................................. 40

ARTICLE XII : MISCELLANEOUS PROVISIONS ..................................................... 43

12.1.   Effectuating Documents and Further Transactions............................ 43
12.2.   Exemption from Transfer Taxes ........................................................ 43
12.3.   Payment of Statutory Fees ................................................................ 43
12.4.   Amendment or Modification of this Plan .......................................... 43
12.5.   Severability of Plan Provisions.......................................................... 44
12.6.   Closing of Chapter 11 Case; Caption Change ................................... 44
12.7.   Successors and Assigns...................................................................... 44
12.8.   Non-Consummation............................................................................ 44
12.9.   Notice to Debtor or Reorganized Debtor ........................................... 45
12.10.  Governing Law .................................................................................. 46
12.11.  Tax Reporting and Compliance ......................................................... 47
12.12.  Exhibits .............................................................................................. 47
12.13.  Filing of Additional Documents ........................................................ 47
12.14.  Plan Documents ................................................................................. 47
12.15.  Immediate Binding Effect .................................................................. 47
12.16.  Reservation of Rights......................................................................... 47

## **APPENDIX**

Appendix I             Transaction Support Agreement

## INTRODUCTION

Quotient Limited (the "<u>Debtor</u>") proposes the following chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code for the resolution of the outstanding Claims and Interests. Capitalized terms used but not defined in this paragraph have the meanings assigned to them in <u>Article I</u>. The classification and treatment of Claims and Interests are set forth in <u>Articles II</u> and <u>III</u>. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the accompanying Disclosure Statement for a discussion of the Debtor's history, business, properties, operations, projections for those operations, risk factors, a summary and analysis of the Plan, and related matters.

## ARTICLE I:
## DEFINED TERMS AND RULES OF INTERPRETATION

A.    <u>Defined Terms</u>. As used in this Plan, capitalized terms shall have the meanings set forth in this <u>Article I</u>. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1.    <u>Additional Quotient Limited Common Equity</u> means the additional Interests in the Debtor to be issued on the Effective Date pursuant to the terms of the Quotient Limited Articles of Incorporation, this Plan, and the Implementation Plan.

1.2.    <u>Administrative Expense Claim</u> means a Claim against the Debtor for costs and expenses of administration of the Chapter 11 Case arising after the Petition Date and on or prior to the Effective Date under sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses of preserving the Estate and operating the Debtor's business on or after the Petition Date until and including the Effective Date and Claims of Governmental Units for taxes (including tax audit Claims) related to tax years commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) any Professional Fee Claim, to the extent Allowed by Final Order under sections 328, 330, 331 or 503 of the Bankruptcy Code; (c) with the exception of section 507(b) Claims, any indebtedness or obligations incurred or assumed by the Debtor during the Chapter 11 Case; (d) any Cure Claim Amount; or (e) any Quarterly Fees.

1.3.    <u>Affiliate</u> has the meaning assigned to such term in section 101(2) of the Bankruptcy Code.

1.4.    <u>Agreed Equity Value</u> means a total equity value of Newco on the Effective Date in the amount of $50 million.

1.5.    <u>Allowed</u> with respect to a Claim or Interest, except as otherwise provided herein: (a) any Claim or Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before the applicable time period fixed by applicable non-bankruptcy law or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or as to which any objection has been determined by a Final Order, either before or after the Effective Date, to the extent such

objection is determined in favor of the respective Holder; (b) any Claim or Interest as to which the liability of the Debtor and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, either before or after the Effective Date; or (c) any Claim or Interest expressly deemed Allowed by this Plan.

1.6.   Avoidance Actions means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtor arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, and under similar or related state or federal statutes or common law, including fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such Claim(s) and Cause(s) of Action were commenced prior to the Effective Date.

1.7.   Bankruptcy Code means title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as amended from time to time and as applicable to the Chapter 11 Case.

1.8.   Bankruptcy Court means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or any other court having competent jurisdiction over the Chapter 11 Case.

1.9.   Bankruptcy Rules means, collectively: (a) the Federal Rules of Bankruptcy Procedure promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Case or any proceedings therein; and (c) the local rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Case.

1.10.   Bridge Noteholder means each beneficial owner of Bridge Notes (including, to the extent its Bridge Notes are assigned to one of its Related Funds, any such Related Fund).

1.11.   Bridge Notes means the senior secured notes issued by the Debtor in aggregate principal amount of $10,000,000 pursuant to the Ninth Supplemental Indenture, dated as of December 15, 2022, amending and supplementing the Senior Secured Notes Indenture.

1.12.   Bridge Notes Claim means any Claim arising under or related to the Bridge Notes.

1.13.   Business Day means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.14.   Cash means (i) legal tender of the United States of America, (ii) Swiss Francs (CHF), (iii) Great British pounds (GBP), or (iv) Euros (EUR).

1.15.   Cause of Action means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including under alter ego theories), whether arising before, on, or after the

Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state law or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.16. <u>Chapter 11 Case</u> means the voluntary case under Chapter 11 of the Bankruptcy Code commenced by the Debtor in the Bankruptcy Court on the Petition Date.

1.17. <u>Claim</u> means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.18. <u>Claims Register</u> means the official register of Claims maintained by the Solicitation Agent.

1.19. <u>Class</u> means each category of Holders of Claims or Interests established under <u>Article III</u> of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.20. <u>Combined Hearing</u> means the combined hearing held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (a) final approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code and (b) confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.21. <u>Committee</u> means any statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

1.22. <u>Commission</u> means the U.S. Securities and Exchange Commission.

1.23. <u>Confirmation</u> means the entry of the Confirmation Order by the Bankruptcy Court.

1.24. <u>Confirmation Date</u> means the date on which Confirmation occurs.

1.25. <u>Confirmation Order</u> means the order of the Bankruptcy Court (a) approving the Disclosure Statement and (b) confirming this Plan pursuant to sections 1125, 1126(b) and 1129 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Debtor and the Requisite Consenting Holders and otherwise consistent with the terms and conditions of the Transaction Support Agreement.

1.26. <u>Convertible Noteholder</u> means each noteholder under the Convertible Notes Indenture (including, to the extent its Convertible Notes are assigned to one of its Related Funds, any such Related Fund).

1.27. <u>Convertible Notes</u> means the convertible notes issued by the Debtor pursuant to the Convertible Notes Indenture.

3

1.28.   Convertible Notes Claim means any Claim arising under or related to the Convertible Notes Indenture.

1.29.   Convertible Notes Indenture means that certain Indenture, dated as of May 26, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) by and among the Debtor, the Guarantors party thereto, and the Convertible Notes Trustee.

1.30.   Convertible Noteholder Private Placement has the meaning set forth in the Transaction Term Sheet.

1.31.   Convertible Notes Trustee means Wilmington Savings Fund Society, FSB, as trustee under the Convertible Notes Indenture.

1.32.   Cure Claim Amount has the meaning set forth in Section 6.2.1 of the Plan.

1.33.   Debtor Release means the releases set forth in Section 10.4 of the Plan.

1.34.   Debtor means Quotient Limited, a limited company incorporated in Jersey, Channel Islands.

1.35.   Definitive Documentation means collectively the documents and agreements necessary to implement, or entered into in connection with, this Plan (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by and referenced in this Plan (as amended, modified, or supplemented from time to time), including: (a) the Plan; (b) the Plan Supplement; (c) the Disclosure Statement and the other solicitation materials in respect of the Plan; (d) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (e) all "Definitive Documents" as defined in the Transaction Support Agreement; (f) all management or consulting agreements of the Reorganized Debtor; and (g) such other documents, pleadings, agreements or supplements as may be reasonably necessary or advisable to implement this Plan and the Transaction Support Agreement.

1.36.   Disbursing Agent means the Reorganized Debtor or any Entity designated by the Debtor or Reorganized Debtor, as applicable, to make or facilitate distributions that are to be made on and after the Effective Date. Distributions on account of Allowed Bridge Notes Claims, Allowed Senior Secured Notes Claims and Allowed Convertible Notes Claims shall be made directly to Bridge Noteholders, Senior Secured Noteholders and Convertible Noteholders.

1.37.   Disclosure Statement means the *Disclosure Statement for the Prepackaged Chapter 11 Plan of Reorganization for Quotient Limited*, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, in a manner acceptable to the Debtor and Requisite Consenting Holders, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

1.38.   Disputed means any Claim, or any portion thereof, that has not been Allowed, but has not been disallowed pursuant to this Plan or a Final Order of the Bankruptcy Court or other court of competent jurisdiction.

1.39.   <u>DTC</u> means the Depository Trust Company.

1.40.   <u>Effective Date</u> means, and shall occur on, the Business Day on which each of the conditions precedent to the occurrence of the Effective Date set forth in <u>Article IX</u> of this Plan has been satisfied or waived in accordance with the terms thereof.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter with the consent of the Debtor and the Requisite Consenting Holders.

1.41.   <u>Employment Agreement</u> has the meaning set forth in <u>Section 6.2.1</u> of the Plan.

1.42.   <u>Entity</u> means an entity as defined in section 101(15) of the Bankruptcy Code.

1.43.   <u>Estate</u> means the estate of the Debtor created in the Chapter 11 Case under section 541 of the Bankruptcy Code.

1.44.   <u>Exchange Act</u> means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq., as now in effect or hereafter amended, and any rules and regulations promulgated thereunder.

1.45.   <u>Exculpated Parties</u> means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (a) the Debtor; and (b) to the extent a Committee is appointed in the Chapter 11 Case, the Committee and each of its members.

1.46.   <u>Exculpation</u> means the exculpation provision set forth in Article 10.6 hereof.

1.47.   <u>Executory Contracts</u> means a contract to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.48.   <u>Existing Subsidiaries</u> means the following direct and indirect wholly owned non-Debtor subsidiaries of the Debtor: (a) Quotient Suisse S.A.; (b) QBD (QS IP) Ltd.; (c) Alba Bioscience Ltd.; (d) Quotient Biodiagnostics Inc.; (e) Quotient Biocampus Ltd.; (f) Quotient Iberia S.L.U.; (g) Quotient Middle-East and Africa FZ-LLC; and (h) Quotient Netherlands BV.

1.49.   <u>Existing Subsidiary Interests</u> means the Interests in the Existing Subsidiaries.

1.50.   <u>Final Order</u> means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court on the docket in the Chapter 11 Case (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil

Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not solely cause such order not to be a Final Order.

1.51.   <u>Finance Co</u> means an entity formed prior to or on the Effective Date that will (a) be wholly owned by Newco; (b) be the direct parent of the Reorganized Debtor and the Existing Subsidiaries; and (c) be the issuer of the Finance Co Notes.

1.52.   <u>Finance Co Bridge Notes</u> means the new senior secured notes or new senior secured term loans issued by Finance Co in the aggregate amount of $10,000,000.00 on the terms and conditions set forth in the Transaction Term Sheet.

1.53.   <u>Finance Co SSN Notes</u> means the new senior secured notes or new senior secured term loans issued by Finance Co in the aggregate amount of $109,523,333.60 on the terms and conditions set forth in the Transaction Term Sheet.

1.54.   <u>Finance Co Notes</u> means the Finance Co Bridge Notes and the Finance Co SSN Notes.

1.55.   <u>Finance Co Notes Documents</u> means the documents governing the Finance Co Notes, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall, to the extent applicable, contain terms consistent with the Transaction Support Agreement.

1.56.   <u>General Unsecured Claims</u> means Claims that are not (a) Administrative Expense Claims, (b) Professional Fee Claims, (c) Priority Tax Claims, (d) Bridge Notes Claims, (e) Senior Secured Notes Claims; (f) Convertible Notes Claims, (g) Other Priority Claims, and (h) Other Secured Claims.

1.57.   <u>Governmental Unit</u> has the meaning provided in section 101(27) of the Bankruptcy Code.

1.58.   <u>GP</u> means Quotient Holdings GP, LLC, which serves as the general partner of Newco.

1.59.   <u>GP Membership Interests</u> means the new membership interests in GP to be issued on the Effective Date pursuant to the terms of the Plan, Transaction Support Agreement and the New Organizational Documents of GP.

1.60.   <u>Guarantors</u> has the meaning set forth in the Transaction Support Agreement.

1.61.   <u>Holder</u> means an Entity holding a Claim or Interest.

1.62.   <u>Impaired</u> means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.63.    Implementation Plan means the Implementation Steps Memo attached as Exhibit B to the Transaction Support Agreement, as the same may be amended from time to time in accordance with the terms of the Transaction Support Agreement.

1.64.    Indemnification Provisions means, collectively, each of the provisions in existence as of the Effective Date (whether in corporate charters, by-laws, limited liability company agreements, other organizational documents, board resolutions, employment contracts or otherwise) whereby the Debtor agrees to indemnify, reimburse, provide contribution or advance fees and expenses to or for the benefit of, defend, exculpate, or limit the liability of, any Indemnified Party.

1.65.    Indemnified Parties means each of the Debtor's respective current and former directors, officers, managers, agents, and employees in their respective capacities as such.

1.66.    Initial Consenting Convertible Noteholders has the meaning set forth in the Transaction Support Agreement.

1.67.    Initial Consenting Secured Noteholders has the meaning set forth in the Transaction Support Agreement.

1.68.    Insider has the meaning provided in section 101(31) of the Bankruptcy Code.

1.69.    Interest means any equity security within the meaning of section 101(16) of the Bankruptcy Code, including any issued and outstanding common stock, preferred stock, limited liability company interest, partnership interest, or any other instrument evidencing an ownership interest in the Debtor prior to the Effective Date (including prior to the Petition Date), whether or not transferable, and any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, rights of conversion, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the common or preferred interests of the Debtor, obligating the Debtor to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, and any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of the Debtor.

1.70.    Lien means, with respect to any interest in property, any mortgage, "lien" as defined in section 101(37) of the Bankruptcy Code, pledge, charge, security interest, easement, or encumbrance of any kind whatsoever affecting such interest in property.

1.71.    Management Incentive Plan has the meaning set forth in the Transaction Term Sheet.

1.72.    Merger Co means a limited company incorporated in Jersey, Channel Islands, which will be owned by Finance Co.

1.73.    Merger Date has the meaning set forth in the Transaction Term Sheet.

1.74.    New Board means the board of directors for each of the Reorganized Debtor, GP, Newco, Finance Co, and Merger Co, appointed as of the Effective Date.

1.75.  New Organizational Documents means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, shareholder agreements, or such other organizational documents of the Reorganized Debtor upon the Effective Date, consistent with the provisions of the Transaction Support Agreement.

1.76.  Newco means the Delaware limited partnership formed prior to or on the Effective Date that will be (a) owned by the Senior Secured Noteholders and Convertible Noteholders, in accordance with the terms of the Implementation Plan, (b) managed by the GP; (c) the direct parent of Finance Co; (d) the issuer of the Newco Partnership Interests; and (e) the indirect parent of the Reorganized Debtor and the Existing Subsidiaries.

1.77.  Newco Partnership Interest means the new partnership interests in Newco to be issued on the Effective Date pursuant to the terms of the Plan, Transaction Support Agreement and the New Organizational Documents of Newco, which, from and after the Effective Date, shall be coupled with a corresponding equivalent proportional amount of GP Membership Interests.

1.78.  Notes Documents means, collectively, (a) the Senior Secured Notes Indenture, (b) the Convertible Notes Indenture, and (c) all other documents entered into pursuant to or in connection with the foregoing documents in clauses (a) and (b) of this definition, including, without limitation, any applicable guarantee and collateral documents.

1.79.  Notes Trustees means the Senior Secured Notes Trustee and the Convertible Notes Trustee.

1.80.  Other Priority Claim means an Allowed Claim under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or Priority Tax Claim.

1.81.  Other Secured Claim means any Claim, other than the Senior Secured Notes Claims and the Bridge Notes Claims, secured by a Lien on collateral in which the Estate has an interest, to the extent of the value of such collateral (a) as agreed to by the Holder of such Claim and the Debtor or (b) as determined pursuant to a Final Order of the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.82.  Person or person means a person as defined in section 101(41) of the Bankruptcy Code.

1.83.  Petition Date means January 10, 2023, the date on which the Debtor commenced the Chapter 11 Case.

1.84.  Plan means this Chapter 11 plan of reorganization, including all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.85.  Plan Supplement means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended,

modified, or supplemented from time to time in accordance with the terms hereof, subject to the consent rights set forth in the Transaction Support Agreement, and in accordance with the Bankruptcy Code and Bankruptcy Rules), including the following, as applicable: (a) the Schedule of Retained Causes of Action; (b) the List of Executory Contracts and Unexpired Leases to be rejected at the Combined Hearing; and (c) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

1.86.    Priority Tax Claim means any Claim of a Governmental Unit of the kind against the Debtor entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.87.    Private Placements means the Senior Secured Noteholder Private Placement and the Convertible Noteholder Private Placement.

1.88.    Pro Rata means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

1.89.    Professional means any Person retained by the Debtor or a statutory committee, if any, pursuant to a Final Order of the Bankruptcy Court entered pursuant to sections 327, 328, or 1103 of the Bankruptcy Code.

1.90.    Professional Fee Claim means any Claim of a Professional for allowance of compensation and/or reimbursement of costs and expenses incurred in the Chapter 11 Case on or before the Effective Date.

1.91.    Professional Fees Escrow Account means the account established pursuant to Section 2.2(b) of the Plan.

1.92.    Proof of Claim means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

1.93.    Quarterly Fees has the meaning given to such term in Section 12.3 of the Plan.

1.94.    Quotient Limited Articles of Incorporation means the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents) of the Debtor.

1.95.    Reinstate, Reinstated or Reinstatement means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest

9

(other than the Debtor or an insider of the Debtor) for any actual pecuniary loss incurred by such Holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder thereof.

1.96.   Related Fund has the meaning set forth in the Transaction Support Agreement.

1.97.   Related Parties means, with respect to an entity, such entity and its current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

1.98.   Release Opt-Out Parties means all Holders of Claims and Interests that opted out of this Plan's third-party releases by properly completing and returning an opt-out election form pursuant to the Solicitation Procedures Order.

1.99.   Released Parties means, collectively, in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Bridge Noteholders; (d) the Senior Secured Noteholders; (e) the Senior Secured Notes Trustee; (f) the Convertible Noteholders; (g) the Convertible Notes Trustee; and (h) with respect to each of the foregoing entities in clauses (a) through (g), such entity's Related Parties; *provided* that an entity shall not be a Released Party if it (x) elects to opt out of the Third-Party Release contained in the Plan or (y) timely objects to the Third-Party Release contained in the Plan, either through (i) a formal objection filed on the docket of the Chapter 11 Case or (ii) an informal objection provided to the Debtor by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Case or via electronic mail, as applicable, before Confirmation of the Plan.

1.100.   Releasing Parties means, collectively, in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Bridge Noteholders; (d) the Senior Secured Noteholders; (e) the Senior Secured Notes Trustee; (f) the Convertible Noteholders; (g) the Convertible Notes Trustee; (h) all Holders of Interests; (i) all Holders of Claims; and (j) with respect to each of the foregoing entities in clauses (a) through (h), such entity's Related Parties; *provided* that an entity shall not be a Releasing Party if it (x) elects to opt out of the Third-Party Release contained in the Plan or (y) timely objects to the Third-Party Release contained in the Plan, either through (i) a formal objection filed on the docket of the Chapter 11 Case or (ii) an informal objection provided to the Debtor by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Case or via electronic mail, as applicable, before Confirmation of the Plan.

1.101.   Reorganized Debtor means the Debtor and any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions implementing this Plan.

1.102.   Requisite Consenting Holders has the meaning set forth in the Transaction Support Agreement.

1.103.   Restructuring Expenses means the reasonable and documented out-of-pocket fees, costs and expenses of Ropes & Gray LLP, and its local counsel, as well as any other reasonable and documented out-of-pocket fees, costs and expenses incurred by the Debtor, the Senior Secured Notes Trustee, and the Convertible Notes Trustee.

1.104.   Retained Debt means $1,000,000 of Senior Secured Notes, which, after the occurrence of the Effective Date, shall be: (a) unsecured; (b) certificated; and (c) held by Finance Co pursuant to the transactions contemplated by the Implementation Plan.

1.105.   Schedule of Retained Causes of Action means the schedule of Causes of Action that shall vest in the Reorganized Debtor on the Effective Date, which will be contained in the Plan Supplement.

1.106.   Section 510(b) Claim means a Claim that is subordinated, or subject to subordination, pursuant to section 510(b) of the Bankruptcy Code, including, without limitation, a Claim arising from the rescission or purchase of a sale or security of the Debtor or an Affiliate of the Debtor, for damages arising from the purchase or sale of such security or for reimbursement or contribution on account of such Claim pursuant to section 502 of the Bankruptcy Code.

1.107.   Senior Secured Noteholder Private Placement has the meaning set forth in the Transaction Term Sheet.

1.108.   Securities Act means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

1.109.   Senior Secured Noteholder means each beneficial owner of Senior Secured Notes (including, to the extent its Senior Secured Notes are assigned to one of its Related Funds, any such Related Fund).

1.110.   Senior Secured Notes means all senior secured notes (other than Bridge Notes) issued by the Debtor pursuant to the Senior Secured Notes Indenture.

1.111.   Senior Secured Notes Claim means any Claim (other than a Bridge Notes Claim) arising under or related to the Senior Secured Notes Indenture.

1.112.   Senior Secured Notes Indenture means that certain Indenture, dated as of October 14, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) by and among the Debtor, the Guarantors party thereto, and Senior Secured Notes Trustee.

1.113.   Senior Secured Notes Trustee means U.S. Bank Trust Company, National Association, as successor in interest to U.S. Bank National Association, as trustee under the Senior Secured Notes Indenture.

1.114.  <u>Solicitation Agent</u> means Kroll Restructuring Administration LLC, in its capacity as solicitation, notice, claims and balloting agent for the Debtor.

1.115.  <u>Solicitation Procedures Order</u> means an order of the Bankruptcy Court Order (I) Scheduling Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing the Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving Prepetition Solicitation Procedures, (IV) Approving the Form and Manner of Notice, (V) Conditionally Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtor Files Schedules, Statements, and Rule 2015.3 Financial Reports, and (VI) Granting Related Relief.

1.116.  <u>Third-Party Release</u> means the releases set forth in <u>Section 10.5</u> of the Plan.

1.117.  <u>Transaction Support Agreement</u> means that transaction support agreement dated as of December 5, 2022, attached hereto as Appendix I, among the Debtor, the Guarantors, the Initial Consenting Secured Noteholders and Initial Consenting Convertible Noteholders, including the Transaction Term Sheet and Implementation Plan attached thereto, as the same may be amended from time to time in accordance with its terms.

1.118.  <u>Transaction Term Sheet</u> means <u>Exhibit A</u> to the Transaction Support Agreement, as the same may be amended from time to time in accordance with the terms of the Transaction Support Agreement.

1.119.  <u>U.S. Trustee</u> means the Office of the United States Trustee for the Southern District of Texas.

1.120.  <u>Unexpired Lease</u> means a lease of nonresidential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.121.  <u>Unimpaired</u> means with respect to a Claim, a Claim that is not Impaired, including any Claim that is Reinstated.

B.      <u>Rules of Interpretation</u>.   For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule, or exhibit filed or to be filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented in accordance with the Transaction Support Agreement and this Plan, in each case to the extent applicable; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections or Articles are references to Sections or Articles of this Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of

this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code (other than section 102(5) of the Bankruptcy Code) will apply; and (i) any reference to an Entity's "subsidiaries" means its direct and indirect subsidiaries. In the event of any conflict between the terms of this Plan and the terms of any of the "Definitive Documents" (as defined in the Transaction Support Agreement), the terms of the "Definitive Documents" (as defined in the Transaction Support Agreement) shall control.

C.    <u>Computation of Time</u>.  In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

D.    <u>Exhibits and Plan Supplement</u>.  All exhibits to this Plan, as well as the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain a copy of the Plan Supplement and the filed exhibits upon written request to the Debtor.  Upon their filing, the Plan Supplement and the exhibits may be inspected (i) in the office of the Clerk of the Bankruptcy Court during normal business hours, (ii) at the Bankruptcy Court's website at www.txs.uscourts.gov, or (iii) free of charge on the Debtor's restructuring website at https://cases.ra.kroll.com/quotientlimited.

E.    <u>Deemed Acts</u>.  Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of this Plan and/or Confirmation Order without any further act by any party.

**ARTICLE II:**
**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of this Plan.

2.1.    <u>Administrative Expense Claims</u>.

Subject to the terms of the Confirmation Order, Holders of Allowed Administrative Expense Claims other than Professional Fee Claims or Priority Tax Claims shall be paid in full in cash in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than ten (10) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition

13

Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or the Reorganized Debtor, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

2.2.   Professional Fee Claims.

(a)   Final Fee Applications.

All Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503 and/or section 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any Professional or any other entity for making a substantial contribution in the Chapter 11 Case) shall file and serve final requests for payment of Professional Fee Claims no later than the first Business Day that is 45 days after the Effective Date.  Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtor and the applicable Professional within 21 days after the filing of the final fee application with respect to the Professional Fee Claim.  Any such objections that are not consensually resolved may be set for hearing on 21 days' notice by the Professional asserting such Professional Fee Claim.  The Professional Fees Escrow Account shall in no way limit or act as a cap on Professional Fee Claims.

(b)   Professional Fees Escrow Account.

On or before the date that is two Business Days after the Confirmation Date, the Debtor shall establish the Professional Fees Escrow Account with the Solicitation Agent.  On the Effective Date, Newco or the Disbursing Agent shall fund the Professional Fees Escrow Account in an amount equal to all asserted Professional Fee Claims that are unfunded or unpaid, accounting for, and outstanding as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Reorganized Debtor); *provided, however*, that the amounts deposited in the Professional Fees Escrow Account do not represent a cap of any amounts to be paid to any Professional.  Amounts held in the Professional Fees Escrow Account shall not constitute property of the Estate or of the Reorganized Debtor.  No Liens, claims, or interests shall encumber the Professional Fees Escrow Account in any way.  The Professional Fees Escrow Account may be an interest-bearing account.  In the event there is a remaining balance in the Professional Fees Escrow Account following payment to all Holders of Professional Fee Claims under the Plan, any such amounts shall be returned to Newco or the Disbursing Agent.

2.3.   Priority Tax Claims.  Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtor either (a) Cash in an amount equal to such Allowed Priority Tax Claim on the date such claim becomes an Allowed Claim (or as soon thereafter as practical), (b) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, through equal annual installment payments in Cash, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period ending not later than five (5) years after the Petition Date, or (c) treatment in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan; *provided*,

*however*, that Priority Tax Claims arising out of obligations incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

2.4.    <u>Post-Effective Date Fees and Expenses</u>.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtor may, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to the implementation and consummation of the Plan incurred by the Reorganized Debtor following the Effective Date that are agreed to be paid by the Reorganized Debtor.  Without in any way limiting the foregoing, the Reorganized Debtor will pay in Cash all reasonable and documented fees and expenses of the Senior Secured Note Trustee and Convertible Notes Trustee incurred after the Effective Date promptly upon request by the Senior Secured Note Trustee or the Convertible Notes Trustee.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE III:
## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1.    <u>Summary of Classification and Treatment of Classified Claims and Interests</u>.

3.1.1    <u>General</u>.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without limitation, voting, Confirmation and distributions pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

(b)    Any Class of Claims or Interests that, as of the commencement of the Combined Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

(c)    Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and

settlement of all Claims and controversies resolved pursuant to the Plan, including all Claims, causes of action and controversies arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against any Released Party, or Holders of Claims, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtor.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.  The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

       3.1.2   <u>Identification of Classes against the Debtor</u>.  The following chart assigns a number to each Class for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST | STATUS | VOTING RIGHTS |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Bridge Notes Claims | Impaired | Entitled to Vote |
| 4 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | Convertible Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7 | Interests in the Debtor | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

      3.2.   <u>Treatment of Claims Against and Interests in the Debtor</u>.

       Each Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtor and such Holder.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

3.2.1   <u>Class 1:  Other Priority Claims</u>.

(a)      <u>Classification</u>:  Class 1 consists of all Other Priority Claims.

(b)      <u>Treatment</u>:  Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable classification or treatment, each Holder of an Allowed Other Priority Claim will receive, in the sole discretion of the Reorganized Debtor:

      i.      payment in full in Cash as promptly as reasonably practicable on the later of (A) the Effective Date and (B) the date on which such Other Priority Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto; or

      ii.     treatment of such Other Priority Claim in any other manner that renders the claim Unimpaired, including Reinstatement.

All Allowed Other Priority Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)      <u>Voting</u>:  Allowed Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Claim in Class 1 shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.2   <u>Class 2:  Other Secured Claims</u>.

(a)      <u>Classification</u>:  Class 2 consists of all Other Secured Claims.

(b)      <u>Treatment</u>:  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable classification or treatment, each Holder of an Other Secured Claim shall, in the sole discretion of the Reorganized Debtor, receive on the Effective Date (or as promptly thereafter as reasonably practicable) or in the ordinary course of the Reorganized Debtor's business:

      i.      payment in full in Cash, including the payment of any interest Allowed and payable under section 506(b) of the Bankruptcy Code;

      ii.     delivery of the collateral securing such Allowed Other Secured Claim; or

      iii.    treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired, including Reinstatement.

(c)      <u>Voting</u>:  Allowed Claims in Class 2 are Unimpaired.  Each Holder of an Allowed Claim in Class 2 shall be conclusively presumed to have accepted this Plan pursuant

to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

### 3.2.3   Class 3:  Bridge Notes Claims.

(a)   <u>Classification</u>:  Class 3 consists of all Bridge Notes Claims.

(b)   <u>Allowance</u>:   The Bridge Notes Claims shall be Allowed in the amount of at least $10,080,000, which is comprised of $10,000,000 on account of outstanding principal as of the Petition Date and at least $80,000 in respect of all accrued and unpaid interest as of the Petition Date.

(c)   <u>Treatment</u>:  On the Effective Date, through the implementation of the transactions contemplated in the Transaction Support Agreement, each Holder of an Allowed Bridge Notes Claim shall receive, in full and final satisfaction of its Allowed Bridge Notes Claim, (i) its Pro Rata share of the Finance Co Bridge Notes and (ii) an amount of Cash equal to the documented fees and expenses of the Senior Secured Notes Trustee under the Senior Secured Notes Indenture outstanding as of the Effective Date, to the extent not previously paid as Restructuring Expenses.

(d)   <u>Voting</u>:  Claims in Class 3 are Impaired.  Therefore, each Holder of an Allowed Claim in Class 3 shall be entitled to vote to accept or reject this Plan.  Notwithstanding the filing of a Proof of Claim by the Senior Secured Notes Trustee in the Debtor's bankruptcy case, the Bridge Noteholders – not the Senior Secured Notes Trustee – shall vote to accept or reject the Plan.

### 3.2.4   Class 4:  Senior Secured Notes Claims.

(a)   <u>Classification</u>:  Class 4 consists of all Senior Secured Notes Claims.

(b)   <u>Allowance</u>:  The Senior Secured Notes Claims shall be Allowed in the amount of at least $140,737,483.68 which is comprised of $136,904,167 on account of outstanding principal as of the Petition Date and at least $3,833,316.68 in respect of all accrued and unpaid interest as of the Petition Date.

(c)   <u>Treatment</u>:  On the Effective Date, through the implementation of the transactions contemplated in the Transaction Support Agreement, each Holder of an Allowed Senior Secured Notes Claim (other than the Holder of the Retained Debt, which will receive such Retained Debt pursuant to the transactions set forth in Section 3 of the Implementation Plan) shall receive, in full and final satisfaction of its Allowed Senior Secured Notes Claim, (i) its Pro Rata share (calculated excluding the Retained Debt) of the Finance Co SSN Notes; (ii) its right to purchase (pro rata based on such Senior Secured Noteholder's percentage ownership of Senior Secured Notes (excluding the Retained Debt) or as otherwise mutually agreed among the Senior Secured Noteholders) the Newco Partnership Interests through the Senior Secured Noteholder Private Placement, together with its applicable share (based on its participation in the Senior Secured Noteholder Private Placement) of additional Newco Partnership Interests issuable in connection with the Senior Secured Noteholder Private Placement as described in the Transaction Support Agreement, which Newco Partnership Interests are subject to potential dilution by the

Management Incentive Plan; and (iii) an amount of Cash equal to the documented fees and expenses of the Senior Secured Notes Trustee under the Senior Secured Notes Indenture outstanding as of the Effective Date, to the extent not previously paid as Restructuring Expenses. On the Merger Date, the Holder of the Retained Debt shall receive the treatment set forth in Section 4 of the Implementation Plan.

(d)     Voting:  Claims in Class 4 are Impaired.  Therefore, each Holder of an Allowed Claim in Class 4 shall be entitled to vote to accept or reject this Plan.  Notwithstanding the filing of a Proof of Claim by the Senior Secured Notes Trustee in the Debtor's bankruptcy case, the Senior Secured Noteholders – not the Senior Secured Notes Trustee – shall vote to accept or reject the Plan.

3.2.5   Class 5:  Convertible Notes Claims.

(a)     Classification:  Class 5 consists of all Convertible Notes Claims.

(b)     Allowance:  The Convertible Notes Claims shall be Allowed in the amount of at least $105,761,979.17, which is comprised of $105,000,000 on account of outstanding principal as of the Petition Date and at least $761,979.17 in respect of all accrued and unpaid interest as of the Petition Date.

(c)     Treatment:  On the Effective Date, through the implementation of the transactions contemplated in the Transaction Support Agreement, the Convertible Notes shall be extinguished for no value and each Holder of an Allowed Convertible Notes Claim shall receive, in full and final satisfaction of its Allowed Convertible Notes Claim, (i) its right to purchase (pro rata based on such Convertible Noteholder's percentage ownership of Convertible Notes or as otherwise mutually agreed among the Convertible Noteholders) the Newco Partnership Interests through the Convertible Noteholder Private Placement; together with its applicable share (based on its participation in the Convertible Noteholder Private Placement) of additional Newco Partnership Interests issuable in connection with the Convertible Noteholder Private Placement as described in the Transaction Support Agreement, which Newco Partnership Interests are subject to potential dilution by the Management Incentive Plan; and (ii) an amount of Cash equal to the documented fees and expenses of the Convertible Notes Trustee under the Convertible Notes Indenture outstanding as of the Effective Date, to the extent not previously paid as Restructuring Expenses.

(d)     Voting:  Allowed Claims in Class 5 are Impaired.  Therefore, each Holder of an Allowed Claim in Class 5 shall be entitled to vote to accept or reject this Plan. Notwithstanding the filing of a Proof of Claim by the Convertible Notes Trustee in the Debtor's bankruptcy case, the Convertible Noteholders – not the Convertible Notes Trustee – shall vote to accept or reject the Plan.

3.2.6   Class 6:  General Unsecured Claims.

(a)     Classification:  Class 6 consists of all General Unsecured Claims.

(b)     Treatment: The legal, equitable, and contractual rights of the Holders of General Unsecured Claims are unaltered by this Plan.  Except to the extent that a Holder

19

of an Allowed General Unsecured Claim agrees to a less favorable treatment, each Holder of an Allowed General Unsecured Claim shall, in the sole discretion of the Reorganized Debtor, receive on the Effective Date (or as promptly thereafter as reasonably practicable) or in the ordinary course of the Reorganized Debtor's business:

i.      Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or

ii.     payment in full in Cash on (A) the Effective Date, or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c)     <u>Voting</u>:  Allowed Claims in Class 6 are Unimpaired.  Each Holder of an Allowed Claim in Class 6 shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.7   <u>Class 7: Interests in the Debtor</u>.

(a)     <u>Classification</u>:  Class 7 consists of all Interests in the Debtor.

(b)     <u>Treatment</u>:  On the Merger Date, all Interests in the Debtor shall be cancelled and released and the Holders thereof shall not receive or retain any property under this Plan on account of such Interests.

(c)     <u>Voting</u>:  Allowed Claims in Class 7 are Impaired.  Each Holder of an Allowed Claim in Class 7 shall be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

3.2.8   <u>Class 8:  Section 510(b) Claims</u>.

(a)     <u>Classification</u>:  Class 8 consists of all Section 510(b) Claims.

(b)     <u>Treatment</u>:  On the Effective Date, all Section 510(b) Claims shall be discharged and extinguished and the Holders thereof shall not receive or retain any property under this Plan on account of such Section 510(b) Claims.

(c)     <u>Voting</u>:  Claims in Class 8 are Impaired.  Each Holder of an Allowed Interest in Class 8 shall be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

## ARTICLE IV:
## ACCEPTANCE OR REJECTION OF THE PLAN

4.1.    Impaired Classes of Claims Entitled to Vote on this Plan.  Claims in Class 3 (Bridge Notes Claims), Claims in Class 4 (Senior Secured Notes Claims) and Claims in Class 5 (Convertible Notes Claims) are Impaired, and the Holders of such Claims are entitled to vote to accept or reject this Plan.

4.2.    Acceptance by an Impaired Class of Claims.  Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class shall have accepted the Plan if, after excluding any Claims held by any Holder whose Claims have been designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Plan and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

4.3.    Presumed Acceptance by Unimpaired Classes.  Class 1 (Other Priority Claims), Class 2 (Other Secured Claims) and Class 6 (General Unsecured Claims) are Unimpaired by this Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders in such Classes are conclusively presumed to have accepted this Plan and therefore shall not be entitled to vote to accept or reject this Plan.

4.4.    Presumed Rejection by Certain Impaired Classes.  Class 7 (Interests in the Debtor) and Class 8 (Section 510(b) Claims) are Impaired by this Plan.  Holders in such Classes will not receive or retain any property under this Plan on account of their Interests and Claims.  Pursuant to section 1126(g) of the Bankruptcy Code, such Holders are conclusively presumed to have rejected this Plan and therefore shall not be entitled to vote to accept or reject this Plan.

4.5.    Reservation of Rights.  The Debtor reserves the right, subject to the terms of the Transaction Support Agreement, to amend, modify, or supplement this Plan for any reason.

## ARTICLE V:
## MEANS FOR IMPLEMENTATION OF THE PLAN

5.1.    Restructuring Transactions.  On the Effective Date, the Debtor, Newco, GP, Finance Co and Merger Co shall enter into the Consensual Transaction described in Section 3 of the Implementation Plan attached to the Transaction Support Agreement as Exhibit B.  On the later of the Effective Date and the Merger Date, the Debtor and Merger Co will enter into a merger agreement under which the Debtor will merge with Merger Co, and following the merger, the Debtor will be the surviving and successor entity.  The actions to implement this Plan and the Implementation Plan may include, in accordance with the consent rights in the Transaction Support Agreement: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Transaction Support Agreement and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms

consistent with the terms of the Plan and the Transaction Support Agreement and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (d) the execution and delivery of contracts or agreements, including, without limitation, transition services agreements, employment agreements, or such other agreements as may be deemed reasonably necessary to effectuate the Plan in accordance with the Transaction Support Agreement; and (e) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

5.2.    <u>Operations between the Confirmation Date and Effective Date</u>.  During the period from the Confirmation Date through and until the Effective Date, the Debtor may continue to operate its business as Debtor in possession in the ordinary course in a manner consistent with its obligations under, and the transactions contemplated by, the Plan, the Transaction Support Agreement and the Definitive Documentation, subject to all applicable orders of the Bankruptcy Court and the provisions of the Bankruptcy Code.

5.3.    <u>Operations between the Effective Date and Merger Date</u>.  During the period from the Effective Date through and until the Merger Date, the Reorganized Debtor shall continue to operate its business for the sole purpose of engaging in activities related to effectuating a merger, as contemplated in the Transaction Support Agreement, and preserving its assets.

5.4.    <u>Sources of Cash Consideration for Plan Distributions</u>.  The Disbursing Agent shall fund distributions and satisfy applicable Allowed Claims under the Plan with Cash on hand and the proceeds from the Private Placements.

5.5.    <u>Additional Quotient Limited Common Equity and Newco Partnership Interests</u>.  On the Effective Date, (a) the Senior Secured Noteholders and the Convertible Noteholders shall receive Newco Partnership Interests, (b) Merger Co and Finance Co shall receive Additional Quotient Limited Common Equity, each as described in the Implementation Plan.

5.6.    <u>Section 1145 Exemption</u>.

(a)    The offering, issuance of, and the distribution under the Plan of the Finance Co Notes, Additional Quotient Limited Common Equity and the Newco Partnership Interests shall be exempt, without further act or actions by any Entity, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code or, if section 1145 of the Bankruptcy Code is not applicable, pursuant to the exemption from registration provided by Section 4(a)(2) of the Securities Act.  To the extent section 1145 of the Bankruptcy Code is available, the Finance Co Notes, Additional Quotient Limited Common Equity and the Newco Partnership Interests may be resold without registration under the Securities Act or other federal securities laws by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with, or the limitations of, any rules and regulations of the Commission, if any, applicable at the time of any future transfer of such securities, (iii) the restrictions, if any, on the transferability of such securities under the terms of the Finance Co Notes

Documents, or the New Organizational Documents, as applicable, and (iv) applicable regulatory approval. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)    Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the initial sale and delivery by the issuer thereof to the Holders of Finance Co Notes, Additional Quotient Limited Common Equity and the Newco Partnership Interests is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the Finance Co Notes, Additional Quotient Limited Common Equity and the Newco Partnership Interests is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

5.7.    <u>Finance Co Notes</u>.  On the Effective Date, the Reorganized Debtor, Newco, and Finance Co shall be authorized to execute and deliver, and to consummate the transactions contemplated by the Finance Co Notes Documents as set forth in the Implementation Plan, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Finance Co Notes Documents).  On the Effective Date, the Finance Co Notes Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of Finance Co, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Confirmation Order or on account of the Confirmation or consummation of this Plan.

5.8.    <u>Corporate Governance, Directors, Officers, and Corporate Action</u>.

5.8.1    <u>Certificates of Incorporation; Operating Agreements</u>.  On the Effective Date, the New Organizational Documents for GP, Newco, Merger Co and Finance Co and all certificates of incorporation of each entity shall go into effect.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, on the Effective Date, the certificate of incorporation of the Reorganized Debtor shall prohibit the issuance of non-voting equity securities. After the Effective Date, subject to Section 5.3 herein, each of the Reorganized Debtor, GP, Newco, Merger Co and Finance Co may amend and restate its certificates or articles of incorporation, by-laws, or similar governing documents, as applicable, as permitted by applicable law.

5.8.2    <u>The New Board</u>.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the number and identity of the members of the New Board shall be selected and approved by the Requisite Consenting Holders, with the constitution of the New Board of the Reorganized Debtor to be identified in the Plan Supplement prior to the Combined Hearing.  After the Effective Date, the New Organizational Documents, as each may be amended thereafter from time to time, shall govern the designation and election of directors.

5.8.3   <u>Corporate Action</u>.  On the Effective Date, (a) the selection of directors and officers for the Reorganized Debtor, Newco, GP, Finance Co, and Merger Co (as applicable), (b) the issuance and distribution of the Additional Quotient Limited Common Equity and Newco Partnership Interests, (c) issuance and distribution of the Finance Co Notes, and (d) all other actions and transactions contemplated by this Plan and the Implementation Plan shall be deemed authorized and approved in all respects (subject to the provisions of this Plan).  All matters provided for in this Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with this Plan, shall be deemed to have timely occurred to the fullest extent permitted under applicable law and the provisions of the Bankruptcy Code.  On and after the Effective Date, the appropriate officers of the Reorganized Debtor, Newco, GP, Finance Co, and Merger Co and members of the New Board shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by this Plan and the Implementation Plan in the name of and on behalf of the respective entities.

5.9.   <u>Continued Corporate Existence</u>.  On and after the Effective Date, after giving effect to each of the actions contemplated under this Plan, the Reorganized Debtor shall continue to exist in accordance with the applicable law in the jurisdiction in which it is formed.  Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided under this Plan, all property of the Estate, including all claims, rights, and Causes of Action and any property acquired by the Debtor or the Reorganized Debtor under or in connection with this Plan, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to this Plan, shall remain vested in the Reorganized Debtor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as specifically provided in this Plan or the Confirmation Order.  Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules.  As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Liens and non-Reinstated Claims, except as specifically provided in this Plan or the Confirmation Order.

5.10.   <u>Cancelation of Liens; Surrender and Cancelation of Notes, Instruments, Certificates, and Other Documents Evidencing Claims</u>.

5.10.1  Except as otherwise provided in this Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to this Plan, all Liens, charges, and encumbrances related to any Claim or Interest, other than any Lien securing an Other Secured Claim that is Reinstated pursuant to this Plan, shall be terminated, null and void and of no effect.  The Holders of Other Secured Claims (other than Other Secured Claims that are Reinstated pursuant to this Plan) shall be authorized and directed to release any collateral or other property of the Debtor (including any Cash collateral) held by such Holder and to take such actions as may be requested by the Debtor (or the Reorganized Debtor, as the case may be) to evidence the release of any Liens, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtor (or the Reorganized Debtor, as the case may be).  Except to the extent otherwise provided in the Plan, (a) on the Effective Date, all notes, instruments, certificates, indentures and other documents evidencing Claims, including the Convertible Notes Claim and the Senior Secured Notes Claim (except with respect to the Retained Debt), shall be cancelled and the obligations of the Debtor discharged in accordance with section 1141(d)(1) of the Bankruptcy

Code and (b) on the Merger Date, all notes, instruments, certificates, indentures and other documents evidencing Senior Secured Notes Claims not previously cancelled under subsection (a) hereof, including the Retained Debt, shall be cancelled and the obligations of the Debtor discharged in accordance with section 1141(d)(1) of the Bankruptcy Code; *provided however*, that the Notes Documents shall survive the Effective Date, shall not be subject to the releases set forth in Article V and Article IX, and shall continue in effect solely for the purposes of, with respect to the Notes Trustees, (i) allowing and instructing each Notes Trustee to receive distributions from the Debtor and to make further distributions to the applicable Holders of Claims (subject to any applicable charging liens), if applicable, and allowing such Holders to accept distributions on account of such Claims; (ii) maintaining, enforcing, and exercising any right or obligation to compensation (including any fees and expenses), indemnification, exculpation, expense reimbursement, or contribution, or any other claim or entitlement that any Notes Trustee may have under the Notes Documents or principle of law against any money or property distributed or allocable on account of such Claims and permitting any Notes Trustee to maintain, enforce and exercise its charging liens and priority of payment rights in connection with the foregoing; (iii) seeking compensation and reimbursement for any reasonable and documented fees and expenses incurred by or on behalf of the Notes Trustees in connection with the implementation of this Plan or the Confirmation Order; (iv) allowing the Notes Trustees to enforce their rights, claims, and interests against any Person or Entity that is not a Released Party; (v) preserving the right of the Notes Trustees to indemnification from the Debtor or any other Entity pursuant and subject to the terms of the applicable Notes Documents, including for the purposes of and relating to any steps or actions taken by the Notes Trustees or documents, agreements, releases, or instruments entered into by the Notes Trustees in connection with the implementation of this Plan and the Transaction Support Agreement; (vi) permitting and directing the Notes Trustees to perform any functions that are necessary to effectuate any of the foregoing or any provisions of this Plan, the Confirmation Order and the Transaction Support Agreement; and (vii) preserving any Notes Trustee's right to appear and be heard in the Chapter 11 Case or in any other proceeding before or in the Bankruptcy Court, including to enforce any obligations owed to each Notes Trustee under this Plan or Confirmation Order or under the Notes Documents; *provided, further*, that all provisions in the Notes Documents which by their own terms survive the termination, discharge, expiration or maturity thereof, shall also survive and continue in full force and effect. Holders of or parties to such cancelled notes, securities, instruments, certificates, and other documents will have no rights arising from or relating to such notes, securities, instruments, certificates, and other documents, or the cancellation thereof, except the rights provided for pursuant to this paragraph and the other provisions of this Plan.

5.10.2  On and after the Effective Date (as to the Convertible Notes Trustee) and on and after the Merger Date (as to the Senior Secured Notes Trustee), the duties and responsibilities of the Notes Trustees under the Notes Documents shall be discharged and released, except (i) to the extent required to effectuate this Plan and the Confirmation Order including, but not limited to, making distributions under this Plan to the Holders of Claims under the Notes Documents and (ii) with respect to any rights of the Notes Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Claims pursuant and subject to the terms of the Notes Documents, including any rights to priority of payment and/or to exercise charging liens. After the performance by the Notes Trustees of any obligations and duties required under or related to the Notes Documents, Plan, and/or Confirmation

Order, the Notes Trustees shall be deemed to be forever relieved of and released from any obligations and duties arising thereunder.

5.11.   <u>Reporting Company Requirements</u>.   On the Effective Date, the Reorganized Debtor, Newco, Finance Co, Merger Co and GP will not be reporting companies under the Exchange Act and shall not be required to file reports with the Commission or any other governmental entity.

5.12.   <u>Existing Subsidiary Interests</u>.   On the Effective Date, the Existing Subsidiary Interests shall remain outstanding and shall be transferred to and owned by Finance Co after giving effect to the transactions set forth in the Implementation Plan. Each Existing Subsidiary shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date.

5.13.   <u>Additional Transactions Authorized under This Plan</u>.

5.13.1  On or after the Effective Date, the Reorganized Debtor shall be authorized to take any such actions as may be necessary or appropriate to Reinstate Claims or Interests or render Claims or Interests not Impaired, as provided for under this Plan, *provided*, *however*, that any such action that would be subject to the consent of the Requisite Consenting Holders pursuant to any Definitive Documentation remains subject to such consent notwithstanding this provision.

5.13.2  On or after the Effective Date, the Disbursing Agent shall pay the Restructuring Expenses.

5.14.   <u>Management Incentive Plan</u>.   Following the Effective Date, Newco may, in accordance with the Transaction Support Agreement, (a) reserve a certain percentage of Newco Partnership Interests as determined by Newco, on a fully diluted, fully distributed basis, for grants made from time to time to employees of the Reorganized Debtor and Newco and (b) otherwise contain terms and conditions (including with respect to participants, allocation, structure, and timing of issuance) generally consistent with those prevailing in the market at the discretion of the New Board.

5.15.   <u>Comprehensive Settlement of Claims and Controversies</u>.   Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests (a) of the Debtor, the Reorganized Debtor, the Estate, and their respective property and (b) Claim and Interest holders, and are fair, equitable, and reasonable.

5.15.1   <u>Preservation of Causes of Action</u>.

(a)       In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article X hereof, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan, including in Article X.

(b)       The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against it.  The Debtor or the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article X of the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation.

(c)       The Reorganized Debtor reserves and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article X of the Plan.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

5.16.   <u>Debtor's Waiver and Release of Claims Against Holders of Interests in the Debtor</u>. On the Merger Date, the Debtor and its Estate shall forever waive, relinquish, and release any and all Causes of Action related to distributions made to any Holder of a Class 7 (Interest in Quotient Limited), including any Avoidance Actions, the Debtor and its Estate had, have, or may have had against any such Holder of a Class 7 (Interest in Quotient Limited) that (a) does not elect to opt out of the Third-Party Release contained in the Plan, (b) does not timely object to the Third-Party Release contained in the Plan, or (c) does timely object to the Third-Party Release contained in the Plan but such objection is resolved before Confirmation of the Plan.

**ARTICLE VI:**
**TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND**
**INSURANCE POLICIES**

6.1.    <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.  On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtor will be assumed by the Debtor in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, <u>unless</u> such Executory Contract or Unexpired Lease (a) was previously assumed or rejected by the Debtor by prior order of the Bankruptcy Court, (b) previously expired or terminated pursuant to its own terms, (c) is subject to a motion to reject such Executory Contract or Unexpired Lease filed prior to the Effective Date, or (d) appears on the "List of Executory Contracts and Unexpired Leases to be rejected at the Combined Hearing" that will be filed with the Plan Supplement.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and the rejection of any Executory Contract or Unexpired Lease for which a motion to reject has been filed, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume or reject Executory Contracts of Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, including any "change of control" provision, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

6.2.    <u>Cure Obligations</u>.

6.2.1    Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan or otherwise shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitations described in below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree (the "<u>Cure Claim Amount</u>").  In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective.  The Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

6.2.2    Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute a finding by the Bankruptcy Court that (a) each such assumption is in the best interest of the Debtor and its Estate, (b) the requirements of section 365(b)(1) of the Bankruptcy Code are deemed satisfied, and (c) the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full

28

release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, as of the Effective Date.

6.2.3    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim Amount pursuant to this Article VI shall result in the full release and satisfaction of any Claim, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any Cure Claim Amount has been fully paid pursuant to this Article VI shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

6.3.    <u>Insurance Policies and Agreements</u>.  Insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date.  To the extent that such insurance policies or agreements are considered to be Executory Contracts or Unexpired Leases, this Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor and its Estate.

6.4.    <u>Existing Compensation and Benefit Plans</u>.  Except as noted in the next sentence, all written contracts, agreements, policies, programs, and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance shall be deemed assumed and assigned by the Debtor to the Reorganized Debtor on the Effective Date.  On or after the Effective Date, each current employee who is currently party to an employment agreement with the Debtor (each, an "<u>Employment Agreement</u>") shall either: (a) have such Employment Agreement assigned to Newco; or (b) receive a new employment agreement on terms satisfactory to such employee and to the Requisite Consenting Holders.

6.5.    <u>Postpetition Contracts and Leases</u>.  All contracts, agreements and leases that were entered into by the Debtor or assumed by the Debtor after the Petition Date in compliance with the terms of the Transaction Support Agreement shall be deemed assigned by the Debtor to the Reorganized Debtor on the Effective Date.

6.6.    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contracts or Unexpired Leases including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any

other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

6.7.    <u>Nonoccurrence of Effective Date</u>.  In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VII:
## PROVISIONS GOVERNING DISTRIBUTIONS

7.1.    <u>Timing and Calculation of Amounts to Be Distributed</u>.  Except as otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in <u>Article VIII</u>.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary in this Plan or the Confirmation Order, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim.  All distributions under the Plan shall be made by the Disbursing Agent.

7.2.    <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Notwithstanding any provision to the contrary in the Plan and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the relevant Disbursing Agent shall establish appropriate reserves for potential payment of such Claims.

7.3.    <u>Means of Cash Payment</u>.  Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of relevant Disbursing Agent by (a) checks or (b) wire transfers.  Cash payments to foreign creditors may be made, at the option of the relevant Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.4.    <u>Minimum; De Minimis Distributions</u>.  No Cash payment of less than $25.00, in the reasonable discretion of the relevant Disbursing Agent, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

7.5.    <u>Withholding and Reporting Requirements</u>.  In connection with this Plan and all distributions thereunder, the Disbursing Agent and the Reorganized Debtor, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent and the Reorganized Debtor, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing such other mechanisms that the Disbursing Agent and Reorganized Debtor, as appropriate, believes are reasonable and appropriate.  All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.  No distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent and Reorganized Debtor, as appropriate, for the payment and satisfaction of such tax obligations.

7.6.    <u>Compliance Matters</u>.  The Disbursing Agent shall be entitled to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

7.7.    <u>Setoff and Recoupment</u>.  The Disbursing Agent may, pursuant to sections 553 and/or 558 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off and/or recoup against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Holder of such Claim; *provided, however*, that neither the failure to assert such rights of setoff and/or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any claim that the Debtor or the Reorganized Debtor may assert against any Holder of an Allowed Claim.

7.8.    <u>Reinstated Claims</u>.  Notwithstanding anything contained herein to the contrary, nothing shall affect, diminish or impair the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Reinstated Claim, including, but not limited to, legal and equitable rights of setoff and/or recoupment against the Holders of any Reinstated Claims.

7.9.    <u>Undeliverable or Non-Negotiated Distributions and Unclaimed Property</u>.  In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned,

or unclaimed property laws to the contrary), and any Claim or Interest of any Holder related to such property shall be discharged and forever barred.

7.10.   <u>Claims Paid by Third Parties</u>.   To the extent a Holder receives a distribution on account of an Allowed Claim and also receives payment from a party that is not the Disbursing Agent on account of such Claim, such Holder shall, within thirty calendar days of receipt thereof, repay or return the distribution to the Disbursing Agent, to the extent the Holder's total recovery on account of such Allowed Claim from the third party and under the Plan exceeds the amount of the Allowed Claim as of the date of any such distribution under the Plan.

7.11.   <u>Applicability of Insurance Policies</u>.   Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.   Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

7.12.   <u>Allocations</u>.   Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed herein.

## ARTICLE VIII:
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

8.1.   <u>Disputed Claims Process</u>.   Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under this Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtor and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Case had not been commenced except that (unless expressly waived pursuant to this Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.   All Proofs of Claim Filed in this Chapter 11 Case shall be considered objected to and Disputed without further action by the Debtor.   Upon the Effective Date, all Proofs of Claim Filed against the Debtor, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.   Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure Claim Amount pursuant to section 365 of the Bankruptcy Code and Claims that the Debtor seeks to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for Allowance) to be an Allowed Claim under this Plan.   Notwithstanding the foregoing, Entities must File Cure Claim Amount objections as set forth in <u>Section 6.2</u> of this Plan

to the extent such Entity disputes the amount of the Cure Claim Amount paid or proposed to be paid by the Debtor or the Reorganized Debtor to a counterparty.

8.2.    Allowance of Claims.  After the Effective Date and subject to the terms of this Plan, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

8.3.    Claims Administration Responsibilities.  Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtor shall have the sole authority to:  (a) reconcile, file, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

8.4.    Disallowance of Claims.  Any Claims held by an Entity that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtor or the Reorganized Debtor by that Entity have been turned over or paid to the applicable Entity.

**ARTICLE IX:**
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

9.1.    Conditions to Effective Date.  This Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.2 of this Plan:

9.1.1    The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order.

9.1.2    The Definitive Documentation shall be negotiated, executed, and delivered simultaneously with the contemplated entry into the Consensual Transaction described in Section 3 of the Implementation Plan and occurrence of the Effective Date, all in form and substance reasonably satisfactory to (a) the Debtor, and (b) the Requisite Consenting Holders.

9.1.3    Issuance of the Finance Co Notes, Additional Quotient Limited Common Equity and the Newco Partnership Interests.

9.1.4    All requisite governmental authorities and third parties shall have approved or consented, or such time period to object, stay, or limit shall have expired, to the transactions contemplated by this Plan, to the extent reasonably required.

9.1.5   All amounts required to be funded or paid on or before the Effective Date pursuant to this Plan or the Confirmation Order, including the Restructuring Expenses, shall have been funded or paid.

9.2.   <u>Waiver of Conditions</u>.  Each of the conditions set forth in <u>Section 9.1</u> of this Plan may be waived in whole or in part with the consent of both the Debtor and Requisite Consenting Holders, in their respective sole discretion.

9.3.   <u>Vacatur of Confirmation Order</u>.  If the Confirmation Order is vacated, which shall occur automatically upon failure of the Effective Date:  (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of 120 days after the date the Confirmation Order is vacated.

9.4.   <u>Notice of Effective Date</u>.  The Debtor shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date on the Effective Date or as soon as practicable thereafter.

## ARTICLE X:
## EFFECT OF PLAN CONFIRMATION

10.1.   <u>Binding Effect</u>.   On the Effective Date, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, all provisions of this Plan or the Plan Supplement, including all agreements, instruments, and other documents filed in connection with this Plan and executed by the Debtor or the Reorganized Debtor in connection with this Plan or the Plan Supplement, shall be binding upon the Debtor, the Reorganized Debtor, and all Holders of Claims against and Interests in the Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan, and all other parties that are affected in any manner by this Plan. Except as expressly provided otherwise in the Plan, all agreements, instruments, and other documents filed in connection with this Plan shall be given full force and effect, and shall bind all parties referred to therein as of the Effective Date, whether or not such agreements are actually issued, delivered, or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

10.2.   <u>Discharge</u>.

10.2.1 <u>Discharge of Claims and Termination of Interests</u>.   Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of

Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtor prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

    10.2.2  <u>Discharge Injunction</u>.  As of the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, all Entities (other than Holders of Reinstated Claims solely in their capacities as such) shall be precluded from asserting against the Debtor or the Reorganized Debtor and their respective assets and property or the Estate, any other or further Claims (other than those Reinstated under this Plan), or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, relating to the Debtor or Reorganized Debtor or any of their respective assets and property or the Estate, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as expressly provided in this Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all non-Reinstated Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor, the Reorganized Debtor, or their respective assets, property and Estate at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  Except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims or Interests that arose prior to the Effective Date and all other parties-in-interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Section 510(b) Claim) against or Interest in the Reorganized Debtor or property of the Reorganized Debtor, other than to enforce any right to a distribution pursuant to the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtor or property of the Reorganized Debtor, other than to enforce any right to a distribution pursuant to this Plan, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Reorganized Debtor or against the property or interests in property of the Reorganized Debtor, other than to enforce any right to a distribution pursuant to this Plan or (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtor or against the property or interests in property of the Reorganized Debtor, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Reorganized Debtor and its respective properties and interest in properties.  For the avoidance of doubt, the provisions of this <u>Section 10.2.2</u> shall not apply with respect to Claims that are Reinstated under this Plan.

10.3.   __Release of Liens.__  Release of Liens.  Except as otherwise provided in this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtor elects to reinstate in accordance with __Section 3.2.2__ hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtor, to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

10.4.   __Releases by the Debtor.__  As of the Effective Date, each Released Party will be deemed released and discharged by each and all of the Debtor, the Reorganized Debtor, and their Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, the Reorganized Debtor, or its Estate, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, or its Estate or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against, or interest in, the Debtor or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, the Transaction Support Agreement, or any other restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities primarily arising out of or relating to any act or omission

of a Released Party that constitutes actual fraud, willful misconduct or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; *provided* that any right to enforce the Plan and Confirmation Order is not so released by this section; *provided, further, however,* that nothing in this section shall operate as a release, waiver, discharge or impairment of any Cause of Action related to the non-occurrence of the Merger Date, and all Causes of Action related to the non-occurrence of the Merger Date are preserved notwithstanding anything to the contrary in this section.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtor, the Reorganized Debtor, or the Estate asserting any claim or Cause of Action released pursuant to the Debtor Release.

10.5.   <u>Releases by Holders of Claims and Interests</u>.  As of the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtor, Reorganized Debtor, and each Released Party from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtor, the Reorganized Debtor, or its Estate, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, the Transaction Support Agreement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities primarily arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; *provided* that any right to enforce the Plan and Confirmation Order is not so released by this section; *provided, further, however,* that nothing in this section shall operate as a release, waiver, discharge or impairment of any Cause of

Action related to the non-occurrence of the Merger Date, and all Causes of Action related to the non-occurrence of the Merger Date are preserved notwithstanding anything to the contrary in this section.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtor and its Estate; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

10.6. **Exculpation.**  From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Case, formulating, negotiating, or implementing this Plan, the Plan Supplement, the Disclosure Statement, the Transaction Support Agreement, the solicitation of acceptances of this Plan, Confirmation, and the pursuit thereof, the consummation of this Plan, the administration of this Plan, the property to be distributed under this Plan, or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Case or implementation of this Plan.

Notwithstanding the foregoing, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Debtor and the Reorganized Debtor shall neither have, nor incur any liability to any Entity for any exculpated Claim; *provided, however*, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Any of the Exculpated Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under this Plan.

10.7. **Injunctions Related to Exculpation and Releases.**

(a)     Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action, or liability of any nature whatsoever, of the types described in <u>Section 10.6</u> of this Plan and relating to the Debtor, the Reorganized Debtor or any of their respective assets and property and/or the Estate, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred, and enjoined from taking any of the following actions against any

Exculpated Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action, or liabilities:  (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting, or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Section 10.2</u> of this Plan; and/or (v) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order. In addition, the Released Parties and Exculpated Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan ((a) and (b), collectively, the "<u>Solicitation Actions</u>") and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in this Plan.  No entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, any Solicitation Actions, without this Court (x) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim for actual fraud, gross negligence, or willful misconduct against any such Released Party or Exculpated Party and such party is not protected pursuant to this provision; and (y) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such Released Party or Exculpated Party.

        (b)       **Except as expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action, or liability of any nature whatsoever, of the types described in <u>Section 10.5</u> of this Plan and relating to the Debtor, the Reorganized Debtor or any of their respective assets and property and/or the Estate, the Chapter 11 Case, this Plan, the Plan Supplement, and/or the Disclosure Statement are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities:  (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting, or**

**in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Section 10.2</u> of this Plan; and/or (v) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.**

10.8.   <u>Survival of Indemnification and Exculpation Obligations</u>.  The obligations of the Debtor to indemnify and exculpate any past and present directors, officers, agents, employees and representatives who provided services to the Debtor prior to or after the Petition Date, pursuant to certificates or articles of incorporation, by-laws, contracts, indentures, and/or applicable statutes, in respect of all actions, suits, and proceedings against any of such officers, directors, agents, employees, and representatives, based upon any act or omission related to service with, for or on behalf of the Debtor, shall not be discharged or Impaired by Confirmation or consummation of this Plan and shall be assumed by the Reorganized Debtor.  For the avoidance of doubt, this <u>Section 10.8</u> affects only the obligations of the Debtor and Reorganized Debtor with respect to any indemnity or exculpation owed to or for the benefit of past and present directors, officers, agents, employees, and representatives of the Debtor, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Person, including any provider of director and officer insurance, owed to or for the benefit of such past and present directors, officers, agents, employees, and representatives of the Debtor.

10.9.   <u>Term of Bankruptcy Injunction or Stays</u>.  All injunctions or stays provided for in the Chapter 11 Case under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the Merger Date.

10.10.  <u>Liability to Governmental Units</u>.  Nothing in the Confirmation Order or the Plan discharges, releases, resolves, precludes, exculpates, or enjoins:  (a) any liability to any Governmental Unit that is not a Claim; (b) any Claim of a Governmental Unit arising on or after the Confirmation Date; (c) any police or regulatory liability to a Governmental Unit to the extent of such entity's liability under non-bankruptcy law on account of its status as the owner or operator of property after the Confirmation Date; or (d) any liability to a Governmental Unit on the part of any Person other than the Debtor or Reorganized Debtor.  For the avoidance of doubt, the foregoing shall not limit the scope of discharge of all Claims and Interests arising prior to the Effective Date under sections 524 and 1141 of the Bankruptcy Code, or limit the Debtor's or Reorganized Debtor's rights under section 525 of the Bankruptcy Code.  Nothing in the Confirmation Order or this Plan shall affect any setoff or recoupment rights of any Governmental Unit.

**ARTICLE XI:
RETENTION OF JURISDICTION**

11.1.   <u>Retention of Jurisdiction</u>.  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim, and the resolution of any objections to the secured or unsecured status, allowance, priority, or amount of Claims or Interests;

(b)      resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(c)      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes from, or relating to distributions under, the Plan;

(d)      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(e)      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the Transaction Support Agreement, and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement, the Plan Supplement or the Confirmation Order, and issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

(f)      resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan, the Transaction Support Agreement, or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any Entity's rights arising from or obligations incurred in connection with this Plan or such documents, including hearing and determining disputes, cases, or controversies arising in connection with the interpretation, implementation or enforcement of the Plan, Transaction Support Agreement or the Confirmation Order;

(g)      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(h)      adjudicate, decide, or resolve any and all disputes as to the ownership of any Claim or Interest;

(i)      approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement, the Plan Supplement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Order or any contract, instrument, release or other agreement or

document created in connection with this Plan, the Disclosure Statement, the Plan Supplement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(j)      hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

(k)      hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 363, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtor only upon allowance thereof pursuant to an order of the Bankruptcy Court;

(l)      hear and determine Causes of Action by or on behalf of the Debtor or the Reorganized Debtor;

(m)      hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(n)      hear and determine any issues arising under, or violations of, section 525 of the Bankruptcy Code;

(o)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

(p)      determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Order, the Transaction Support Agreement, or any contract, instrument, release, or other agreement, or document created in connection with this Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Order;

(q)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(r)      hear and determine all matters related to the property of the Estate from and after the Confirmation Date;

(s)      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code;

(t)      enter a final order or decree concluding or closing the Chapter 11 Case; and

(u)      hear any other matter not inconsistent with the Bankruptcy Code;

*provided, however*, that the Bankruptcy Court shall not retain jurisdiction after the Effective Date over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, including, for

the avoidance of doubt, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII:
## MISCELLANEOUS PROVISIONS

12.1.   <u>Effectuating Documents and Further Transactions</u>.   Each of the Debtor and the Reorganized Debtor is authorized to execute, deliver, file or record such contracts, instruments, certificates, notes, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Implementation Plan, the Additional Quotient Limited Common Equity, the Newco Partnership Interests, the GP Membership Interests and the Finance Co Notes issued under or in connection with this Plan.

12.2.   <u>Exemption from Transfer Taxes</u>.   To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code: (a) the issuance, transfer or exchange of equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; or (c) the making or delivery of any deed or other instrument of transfer under this Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing, or recording fee or other similar tax or governmental assessment in the United States. The Confirmation Order shall direct the appropriate federal, state, or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

12.3.   <u>Payment of Statutory Fees</u>.   All fees due and payable pursuant to section 1930(a)(6) of Title 28 of the United States Code ("<u>Quarterly Fees</u>") prior to the Effective Date shall be paid by the Debtor on the Effective Date.   After the Effective Date, the Reorganized Debtor shall be liable for any and all Quarterly Fees when they are due and payable after the Effective Date.   The Debtor shall file all Monthly Reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.   From and after the Effective Date, the Reorganized Debtor shall file with the Bankruptcy Court Quarterly Reports in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Reorganized Debtor during the applicable period, attested to by an authorized representative of the Reorganized Debtor.   The Reorganized Debtor shall remain obligated to pay Quarterly Fees to the U.S. Trustee until the earliest of the Debtor's cases being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

12.4.   <u>Amendment or Modification of this Plan</u>.   Subject to section 1127 of the Bankruptcy Code, the Debtor may alter, amend or modify this Plan or any exhibits thereto at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, solely in accordance with the Transaction Support Agreement.   Any Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment, or modification is made in accordance with the Transaction

Support Agreement and does not materially and adversely change the treatment of the Claim of such Holder.

12.5.    <u>Severability of Plan Provisions</u>.  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted, provided that any such holding, alteration or interpretation complies and is consistent with the Transaction Support Agreement and does not adversely impact the Holders of Convertible Notes Claims, Holders of Bridge Notes Claims and Holders of Senior Secured Notes Claims.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.6.    <u>Closing of Chapter 11 Case; Caption Change</u>.  The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case, *provided,* as of the Effective Date, the Reorganized Debtor may submit separate orders to the Bankruptcy Court under certification of counsel closing each of the closing cases and changing the caption of the Chapter 11 Case accordingly, *provided further* that matters concerning Claims may be heard and adjudicated in a remaining case regardless of whether the applicable Claim is against a Debtor in a closing case.  Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last remaining case, the Reorganized Debtor shall file a final report with respect to all of the Chapter 11 Case pursuant to Local Rule 3022-1(c).

12.7.    <u>Successors and Assigns</u>.  This Plan shall be binding upon and inure to the benefit of the Debtor, and its successors and assigns, including, without limitation, the Reorganized Debtor.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

12.8.    <u>Non-Consummation</u>.  If consummation of this Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor, or any other Person, or (iii) constitute an admission of any sort by the Debtor, or any other Person.

12.9.   <u>Notice to Debtor or Reorganized Debtor</u>.  All notices, requests and demands to or upon the Debtor or the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtor | Counsel to the Debtor |
|---|---|
| Quotient Limited<br>PO Box 1075—JTC House<br>28 Esplanade, St Helier<br>Jersey JE4 2QP<br>Channel Islands<br>Attn: Manuel O. Méndez<br>Email: Manuel.Mendez@quotientbd.com | Matt Murphy, Esq.<br>Matthew J. Micheli, Esq.<br>Michael Jones, Esq.<br>Paul Hastings LLP<br>71 S. Wacker Drive, Suite 4500<br>Chicago, Illinois 60606<br>Email: mattmurphy@paulhastings.com<br>mattmicheli@paulhastings.com<br>michaeljones@paulhastings.com<br><br>and<br><br>Jayme Goldstein<br>Christopher Guhin<br>200 Park Avenue<br>New York, New York 10166<br>Telephone:  (212) 318-6000<br>Facsimile:  (212) 319-4090<br>Email:  jaymegoldstein@paulhastings.com<br>chrisguhin@paulhastings.com |
| **Reorganized Debtor** | **Bridge Noteholders** |
| Quotient Limited<br>PO Box 1075—JTC House<br>28 Esplanade, St Helier<br>Jersey JE4 2QP<br>Channel Islands<br>Attn: Manuel O. Méndez<br>Email: Manuel.Mendez@quotientbd.com<br><br>With a copy to:<br><br>Matt Murphy, Esq.<br>Matthew J. Micheli, Esq.<br>Michael Jones, Esq.<br>Paul Hastings LLP<br>71 S. Wacker Drive, Suite 4500<br>Chicago, Illinois 60606<br>Email: mattmurphy@paulhastings.com<br>mattmicheli@paulhastings.com<br>michaeljones@paulhastings.com | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036<br>Attention: Ryan Preston Dahl, Esq.<br>Sam Badawi, Esq.<br>Jonathan Gill, Esq.<br>Matthew Roose, Esq.<br>Email:  ryan.dahl@ropesgray.com<br>jonathan.gill@ropesgray.com<br>sam.badawi@ropesgray.com<br>matthew.roose@ropesgray.com<br><br>With a copy to:<br><br>Pillsbury Winthrop Shaw Pittman LLP<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111-5998<br>Attention: Joshua D. Morse, Esq.<br>John A. Pintarelli, Esq.<br>Email:  joshua.morse@pillsburylaw.com |

| | john.pintarelli@pillsburylaw.com |
|---|---|
| and<br><br>Jayme Goldstein<br>Christopher Guhin<br>200 Park Avenue<br>New York, New York 10166<br>Telephone:  (212) 318-6000<br>Facsimile:  (212) 319-4090<br>Email:  jaymegoldstein@paulhastings.com<br>chrisguhin@paulhastings.com | |
| **Senior Secured Noteholders** | **Convertible Noteholders** |
| Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036<br>Attention: Ryan Preston Dahl, Esq.<br>Sam Badawi, Esq.<br>Jonathan Gill, Esq.<br>Matthew Roose, Esq.<br>Email:  ryan.dahl@ropesgray.com<br>jonathan.gill@ropesgray.com<br>sam.badawi@ropesgray.com<br>matthew.roose@ropesgray.com<br><br>With a copy to:<br><br>Pillsbury Winthrop Shaw Pittman LLP<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111-5998<br>Attention: Joshua D. Morse, Esq.<br>John A. Pintarelli, Esq.<br>Email:  joshua.morse@pillsburylaw.com<br>john.pintarelli@pillsburylaw.com | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036<br>Attention: Ryan Preston Dahl, Esq.<br>Sam Badawi, Esq.<br>Jonathan Gill, Esq.<br>Matthew Roose, Esq.<br>Email:  ryan.dahl@ropesgray.com<br>jonathan.gill@ropesgray.com<br>sam.badawi@ropesgray.com<br>matthew.roose@ropesgray.com<br><br>With a copy to:<br><br>Pillsbury Winthrop Shaw Pittman LLP<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111-5998<br>Attention: Joshua D. Morse, Esq.<br>John A. Pintarelli, Esq.<br>Email:  joshua.morse@pillsburylaw.com<br>john.pintarelli@pillsburylaw.com |
| **United States Trustee** | |
| Office of the United States Trustee<br>515 Rusk, Suite 3516<br>Houston, Texas 77002<br>Attn: Stephen Statham | |

12.10.  <u>Governing Law</u>.  Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, and subject further to <u>Section 11.1</u> of this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with (a) the Bankruptcy Code, the Bankruptcy Rules or other federal law to the extent applicable and (b) if none of such law is applicable, the laws of the State of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

12.11.  <u>Tax Reporting and Compliance</u>.  The Reorganized Debtor is hereby authorized, on behalf of the Debtor, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of the Debtor for all taxable periods ending after the Petition Date through, and including, the Effective Date.

12.12.  <u>Exhibits</u>.  All exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

12.13.  <u>Filing of Additional Documents</u>.  On or before substantial consummation of this Plan, the Reorganized Debtor and the Debtor shall, as applicable, file such agreements and other documents as may be necessary or appropriate to effectuate and evidence further the terms and conditions of this Plan.

12.14.  <u>Plan Documents</u>.   The Plan and the Plan Supplement, including all exhibits, supplements, appendices and schedules thereto, and any modifications to any of the foregoing, shall be in form and substance acceptable to the Debtor and Requisite Consenting Holders.

12.15.  <u>Immediate Binding Effect</u>.  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

12.16.  <u>Reservation of Rights</u>.  Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the Debtor with respect to this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtor, the Bridge Noteholders, the Senior Secured Noteholders, the Convertible Noteholders or any other Person with respect to Claims against and Interests in the Debtor.

Dated:  January 9, 2023                    QUOTIENT LIMITED.

                                           __/s/ *Manuel O. Mendez*_____
                                           Manuel O. Mendez
                                           Chief Executive Officer

## **APPENDIX I**

**Transaction Support Agreement**

**EXECUTION VERSION**

## AMENDED AND RESTATED TRANSACTION SUPPORT AGREEMENT

This AMENDED AND RESTATED TRANSACTION SUPPORT AGREEMENT (as it may be amended, supplemented or otherwise modified as provided herein, this "Agreement"), initially dated as of December 5, 2022 and amended and restated as of January 9, 2023, is entered into among:

(a) Quotient Limited (the "Issuer" and, together with its direct and indirect subsidiaries, the "Company"), a public limited liability no par value company formed under the laws of Jersey, Channel Islands, and the guarantors party to the Indentures (as defined below) (the "Guarantors");

(b) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders of:

    i. senior secured notes (the "Senior Secured Notes") issued under that certain Indenture, dated as of October 14, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Senior Secured Notes Indenture"), by and among the Issuer, the Guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee (the "Trustee"), which holders are party to this Agreement as of the date herein (the "Initial Consenting Secured Noteholders"); and

    ii. convertible notes (the "Convertible Notes") issued under that certain Indenture, dated as of May 26, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Convertible Notes Indenture" and together with the Senior Secured Notes Indenture, the "Indentures"), by and among the Issuer, the Guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee, which holders are party to this agreement as of the date herein (the "Initial Consenting Convertible Noteholders" and together with the Initial Consenting Secured Noteholders, the "Initial Consenting Holders").

The Issuer, the Guarantors, and each Consenting Holder (as defined below) are collectively referred to herein as the "Parties" and each, individually as a "Party." All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Senior Secured Notes Indenture, the Convertible Notes Indenture, or the Transaction Term Sheet (as defined below), as applicable.

WHEREAS, subject to the terms and conditions set forth herein, the Parties have agreed to, among other things (i) consummate, support, and consent to (as applicable) a series of transactions contemplated by this Agreement and the Definitive Documents (as defined below) (collectively, the "Transaction") on the Closing Date (as defined below) on the terms set forth in the term sheet attached hereto as **Exhibit A** (the "Transaction Term Sheet"); and (ii) cause the Transaction to be implemented in a manner materially consistent with the steps set forth in the implementation steps memo attached hereto as **Exhibit B** (the "Implementation Steps Memo"), as

a Consensual Transaction (as defined below) or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion.

NOW, THEREFORE, the Parties, on a several but not joint basis, agree as follows:

**SECTION 1.    Certain Definitions.**

Section 1.01 Definitions.  As used in this Agreement, the following terms have the following meanings:

(a)    "**Agreed Equity Value**" has the meaning ascribed to such term in the Transaction Term Sheet.

(b)    "**Approved Budget**" means an initial budget that the Issuer has delivered to and that has been approved by the Requisite Consenting Holders, as the same may be modified from time to time with the consent of the Requisite Consenting Holders, for the period commencing on the date of this Agreement and ending on the Outside Date, showing a weekly itemization of cashflows, a copy of which is attached hereto as Exhibit C.

(c)    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

(d)    "**Business Day**" means any day other than a day which is a Saturday, Sunday, or other day on which the Federal Reserve Bank of New York is closed.

(e)    "**Closing**" means the consummation of all aspects of the Transaction.

(f)    "**Closing Date**" means the date upon which all aspects of the Transaction are consummated.

(g)    "**Code**" means the United States Internal Revenue Code of 1986, as amended.

(h)    "**Consensual Transaction**" means a Transaction consummated in part pursuant to either step 3.1 through step 3.3 of the Implementation Steps Memo or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion.

(i)    "**Consenting Convertible Noteholders**" means, collectively, the Initial Consenting Holders that hold Convertible Notes in their capacity as such, and any Subsequent Consenting Holder that holds Convertible Notes in its capacity as such.

(j)    "**Consenting Holders**" means, collectively, the Consenting Senior Secured Noteholders, the Consenting Convertible Noteholders, in each case, in their capacity as such.

(k)    "**Consenting Senior Secured Noteholders**" means, collectively, the Initial Consenting Holders that hold Senior Secured Notes in their capacity as such, and any Subsequent Consenting Holder that holds Senior Secured Notes in its capacity as such.

(l)     "**Definitive Documents**" means, collectively, all documents related to the Transactions, including, without limitation, documents required to effectuate the Secured Debt Private Placement, the documents required to effectuate the Convertible Notes Private Placement, the indenture governing the New Senior Secured Notes, the New Organizational Documents, documentation sufficient to extinguish and cancel all existing equity of the Issuer for no consideration, all documents related to any proceeding under the Bankruptcy Code, and any other documents directly related to any of the foregoing, in each case consistent with this Agreement and the Transaction Term Sheet, and otherwise in form and substance reasonably satisfactory to the Issuer and, as applicable, the Requisite Affected Holders.

(m)     "**Exchange Act**" means the Securities Exchange Act of 1934.

(n)     "**Initial Consenting Convertible Noteholders**" shall have the meaning assigned to such term in the recitals hereto.

(o)     "**Initial Consenting Secured Noteholders**" shall have the meaning assigned to such term in the recitals hereto.

(p)     "**Initial Consenting Holders**" shall have the meaning assigned to such term in the recitals hereto.

(q)     "**Law**" means statute or law (including common law), ordinance, rule, treaty, code or regulation and any decree, injunction, judgment, order, ruling, assessment, writ or other legal requirement.

(r)     "**Milestone**" means the completion of each of the following events or circumstances in the timeframes stated:

(i)     Commencement of the Bankruptcy Case on or before January 10, 2023 (the "Petition Date");

(ii)     Entry of an order by the Bankruptcy Court approving solicitation procedures with respect to the Plan on or before 14 days after the Petition Date (or such later date as may be necessary to accommodate the Bankruptcy Court's calendar);

(iii)     Entry of the Confirmation Order on or before 40 days after the Petition Date (or such later date as may be necessary to accommodate the Bankruptcy Court's calendar); and

(iv)     Completion of all steps of either the Implementation Steps Memo or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion, by no later than May 31, 2023.

(s)     "**Outside Date**" has the meaning set forth in <u>Section 5.02(a)</u> of this Agreement.

(t)     "**Paul Hastings**" means Paul Hastings LLP, as counsel to the Issuer.

(u)     "**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity, or other entity or organization; provided that "Governmental Entity" for these purposes means the United States and any State (including the District of Columbia and Puerto Rico), Commonwealth, District, Territory, municipality (including a political subdivision or public agency or instrumentality of a State), foreign state, or a department, agency, or instrumentality of the foregoing.

(v)     "**Pillsbury**" means Pillsbury Winthrop Shaw Pittman LLP, as counsel to certain Initial Consenting Holders.

(w)     "**pro rata basis**" or "**pro rata share**" means, as applied to any obligation, consent, agreement or other action of the Senior Secured Noteholders, for each Consenting Senior Secured Noteholder, such Consenting Senior Secured Noteholder's proportionate interest, by principal amount, in all Senior Secured Notes held by Consenting Senior Secured Noteholders; and, as applied to any obligation, consent, agreement or other action of the Convertible Noteholders, for each Consenting Convertible Noteholder, such Consenting Convertible Noteholder's proportionate interest, by principal amount, in all Convertibles Notes held by Consenting Convertible Noteholders.

(x)     "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Senior Secured Notes or Convertible Notes in its capacity as a dealer or market maker in such Senior Secured Notes or Convertible Notes; and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

(y)     "**Related Fund**" means, with respect to a Consenting Holder, any fund managed, advised or sub-advised by such Consenting Holder and any affiliate of such Consenting Holder.

(z)     "**Requisite Affected Holders**" means, with respect to any Definitive Document, provision of this Agreement, or provision of any exhibit to this Agreement that affects, directly or indirectly:

(i)     the Consenting Senior Secured Noteholders or the treatment of the Senior Secured Notes, then the Requisite Senior Secured Noteholders; and

(ii)     the Consenting Convertible Noteholders or the treatment of the Convertible Notes, then the Requisite Convertible Noteholders.

(aa)     "**Requisite Consenting Holders**" means the Requisite Senior Secured Noteholders and the Requisite Convertible Noteholders, each in their capacity as such, and references herein to the consent of, agreement of, or other action by Requisite Consenting Holders, shall mean the consent of, agreement of, or other action by, each of the Requisite Senior Secured Noteholders and the Requisite Convertible Noteholders, voting on such consent, agreement, or other action as a separate class.

(bb)     "**Requisite Convertible Noteholders**" means (i) Consenting Convertible Noteholders holding, in the aggregate, a majority of the Convertible Notes held by all Consenting

Convertible Noteholders as of the date of action taken or consent provided by the Requisite Convertible Noteholders pursuant to this Agreement and (ii) each of the Specified Noteholders, without prejudice to any greater threshold of consent required to amend, waive, or consent to revisions to the Convertible Notes Indenture.

(cc)     "**Requisite Senior Secured Noteholders**" means (i) Consenting Senior Secured Noteholders holding, in the aggregate, a majority of the Senior Secured Notes held by all Consenting Senior Secured Noteholders as of the date of action taken or consent provided by the Requisite Senior Secured Noteholders pursuant to this Agreement and (ii) each of the Specified Noteholders, without prejudice to any greater threshold of consent required to amend, waive, or consent to revisions to the Senior Secured Notes Indenture.

(dd)     "**Ropes**" means Ropes & Gray LLP, as counsel to the Consenting Holders.

(ee)     "**SEC**" means the U.S. Securities and Exchange Commission.

(ff)     "**SEC Documents**" means the reports, registrations, filings, statements, schedules, and submissions together with any required amendments thereto filed with the SEC prior to the date of this Agreement.

(gg)     "**Securities Act**" means the Securities Act of 1933.

(hh)     "**Specified Noteholders**" means the Consenting Holders specified on Exhibit 2 hereto.

(ii)     "**Strategic Change**" means the change in the business strategy of the Company in which the Company would suspend its activities focused on the commercialization of its transfusion diagnostics products and would instead focus in the near term exclusively on development and commercialization of MosaiQ products for the autoimmune and allergy clinical diagnostics markets.

(jj)     "**Subsequent Consenting Holder**" means any holder or transferee of Senior Secured Notes or Convertible Notes that executes a Joinder Agreement in respect of such Senior Secured Notes or Convertible Notes, in accordance with the terms of this Agreement and in its capacity as a holder or transferee of such Senior Secured Notes or Convertible Notes, as the case may be.

(kk)     "**Support Effective Date**" means the date on which counterpart signature pages to this Agreement have been executed and delivered by the Issuer and the Initial Consenting Holders.

(ll)     "**Support Period**" means the period commencing on the Support Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 5  hereof.

(mm)     "**Variance Report**" means a report delivered by the Issuer to the Consenting Holders, showing comparisons of actual results for each line item against such line item in the Approved Budget.

Section 1.02 Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement; and

(g)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)      the use of "include" or "including" is without limitation, whether stated or not.

**SECTION 2.    Closing.**

Section 2.01 Closing and Location.  The Closing will take place at the offices of Paul Hastings (200 Park Avenue, New York, New York 10166), remotely by conference call and electronic exchange and delivery of signatures and documents (i.e., email of PDF documents), or such other place as will be mutually agreed to by the Issuer and the Requisite Consenting Holders.

**SECTION 3.    Agreements of the Consenting Holders.**

Section 3.01 Support.  During the Support Period and solely to the extent consistent with a Consensual Transaction, each Consenting Holder shall, as applicable, and in accordance with the commitments as described more fully in the Transaction Term Sheet:

(a)      support, act in good faith, and take all reasonable actions necessary to implement and consummate a Consensual Transaction by February 17, 2023;

(b)      timely vote, or cause to be voted, all of the claims (as defined in section 101(5) of the Bankruptcy Code) held by such Consenting Holder by timely delivering its duly executed and completed ballot(s) accepting any Plan (as defined in the Implementation Steps Memo), and filed by the Issuer following commencement of the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code;

(c)      to the extent it is a Senior Secured Noteholder, consent to the Bridge Notes contemplated in the Transaction Term Sheet and timely execute and deliver such other and further instruments and documents reasonably necessary to allow for the issuance of the Bridge Notes on or prior to December 20, 2022;

(d)      to the extent it is a Senior Secured Noteholder, contemporaneously with the consummation of a Consensual Transaction, participate in the Secured Exchange and the Secured Debt Private Placement in accordance with its commitments as specified in Schedule 1 to the Transaction Term Sheet (as in effect from time to time);

(e)      to the extent it is a Convertible Noteholder, contemporaneously with the consummation of a Consensual Transaction, surrender its Convertible Notes for cancellation for no consideration and participate in the Convertible Notes Private Placement in accordance with its commitments as specified in Schedule 1 to the Transaction Term Sheet (as in effect from time to time);

(f)      to the extent it is a Convertible Noteholder, agree to timely execute and deliver such other and further instruments and documents reasonably necessary to amend the Convertible Notes Indenture, as promptly as practicable and no later than December 13, 2022, to allow for and cause the consummation of the transactions contemplated in steps 3.1(a) of the Implementation Steps Memo;

(g)      cooperate in good faith with the Issuer to provide for tax treatment for the Transaction reasonably satisfactory to the Issuer and the Consenting Noteholders;

(h)      negotiate, complete, enter into, and effectuate the Definitive Documents within the timeframes contemplated herein, which will be in form and substance materially consistent with this Agreement, the Transaction Term Sheet and the Implementation Steps Memo, and otherwise in form and substance reasonably satisfactory to the Issuer and the Requisite Affected Holders;

(i)      give any notice, order, instruction, or direction to any trustee or collateral agent reasonably necessary to give effect to the Transaction;

(j)      not direct any trustee or collateral agent to take any action inconsistent with such Consenting Holder's obligations under this Agreement and, if any applicable trustee or collateral agent takes any action inconsistent with this Agreement, such Consenting Holder will use its commercially reasonable efforts to direct such trustee or collateral agent to cease, desist, and refrain from taking any such action unless necessary to effectuate the transactions contemplated by this Agreement;

(k)      act in good faith consistent with this Agreement, including by providing consent to amendments to the Indentures reasonably necessary to permit or give effect to the Transaction; and

(l)      refrain from directly or indirectly taking any action that would be inconsistent with this Agreement or interfere with the Transaction in any respect.

Notwithstanding anything in this Agreement to the contrary, (i) as determined to be necessary and advisable by the Required Consenting Holders at any time prior to the filing of a petition under the Bankruptcy Code, the Requisite Consenting Holders, in their sole discretion, may direct that the Transaction be implemented through an alternative transaction structure or means of implementation, (ii) nothing in this Section 3.01 or otherwise in this Agreement shall (a) require any Consenting Holder to take any action or to refrain from taking any action with respect to the Transaction to the extent it determines in good faith, upon advice of outside counsel, that the taking or failing to take such action would be inconsistent with applicable Law, and any such action or inaction pursuant to this Section 3.01 shall not be deemed to constitute a breach of this Agreement other than for purposes of determining whether an Issuer Termination Event has occurred that would entitle the Issuer to terminate this Agreement pursuant to Section 5.03(b) hereof, (b) require any Consenting Holder to provide any indemnity (other than any indemnification expressly provided for by Newco (as defined in the Implementation Steps Memo) pursuant to the Transaction) nor post any bond in connection with any action or the giving of any notice, order, direction, or instruction, or (c) prevent any Consenting Holders from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

Section 3.02 Transfers.  Other than as contemplated by the Transaction Term Sheet and the Implementation Steps Memo (or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion), each Consenting Holder agrees that during the Support Period, it shall not sell, assign, transfer, encumber, or otherwise dispose of ("Transfer"), directly or indirectly, any of the Senior Secured Notes, Convertible Notes, or any right or interest therein (collectively, the "Claims and Interests") (including grant any proxies, deposit into a voting trust, or enter into a voting agreement with respect to such Claims and Interests), and any purported Transfer shall be void and without effect unless the transferee thereof (a) is an Initial Consenting Holder, (b) is a Related Fund of an Initial Consenting Holder, or (c) any other Person consented to by the Issuer (such consent not to be unreasonably conditioned, withheld, or delayed), provided that, before such Transfer, such transferee shall agree in writing for the benefit of the Parties to become a Consenting Holder and to be bound by all of the terms of this Agreement applicable to Consenting Holders (including with respect to any and all Claims and Interests it already may hold against or in the Issuer before such Transfer) by executing a joinder agreement in the form attached hereto as **Exhibit 1** (a "Joinder Agreement") and delivering an executed copy of the same within two Business Days following such execution, to Ropes, Pillsbury, and Paul Hastings, in which event, the transferee shall be deemed to be a Subsequent Consenting Holder hereunder to the extent of such transferred rights and obligations and the transferor shall be deemed to relinquish certain of its rights (and be released from certain of its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Holder agrees that any Transfer of any Claim and Interest that does not comply

with the terms and procedures set forth herein shall be deemed void *ab initio,* and each other Party shall have the right to enforce the voiding of such Transfer.

Section 3.03 <u>Additional Claims or Interests</u>.  If any Consenting Holder acquires additional claims against or interests in the Issuer, including any Senior Secured Notes or Convertible Notes, then each such Consenting Holder will promptly notify Ropes, Pillsbury and Paul Hastings, and each such Consenting Holder agrees that the acquired claims or interests will be subject to this Agreement and subject to treatment materially consistent with the Transaction Term Sheet and otherwise reasonably acceptable to the Parties.

Section 3.04 <u>Forbearance</u>.  To the extent inconsistent with the Transaction, the Consenting Holders agree to forbear during the Support Period from the exercise of (or to direct an agent or trustee to exercise) any and all rights and remedies in contravention of this Agreement, whether at law, in equity, by agreement, or otherwise, which are or become available to them in respect of the Senior Secured Notes, Convertible Notes, or any other Claims and Interests.  Additionally, to the extent inconsistent with the Transaction, during the Support Period, the Consenting Holders agree not to support, join, or otherwise assist any Person in litigation against the Issuer in connection with the Transaction, Senior Secured Notes, Convertible Notes, or any other Claims and Interests; <u>provided</u>, that the foregoing will not limit any of the Consenting Holders' rights to enforce any rights under this Agreement.

Section 3.05 <u>Liquidity</u>.  Assuming compliance by the Issuer with Section 6.01 hereof, the Requisite Senior Secured Noteholders set forth on Schedule 1 to the Transaction Term Sheet shall fund the Bridge Notes by no later than December 20, 2022.

**SECTION 4.     Agreements of the Issuer.**

Section 4.01 <u>Support</u>.  Subject to <u>Section 5.03</u>, during the Support Period, the Issuer shall:

(a)     use commercially reasonable efforts to obtain any required regulatory or third-party approvals for the Transaction,

(b)     use commercially reasonable efforts to meet the Milestones, effectuate the Transaction contemplated in the Transaction Term Sheet and either the Implementation Steps Memo or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion, and to negotiate, complete, enter into, and effectuate the Definitive Documents, in each case within the timeframes contemplated herein, which will be in form consistent with this Agreement and the Transaction Term Sheet, and otherwise in form and substance reasonably satisfactory to the Issuer and the Requisite Affected Parties,

(c)     work in good faith with the Consenting Holders to provide for tax treatment for the Transaction satisfactory to the Consenting Holders and provide any information reasonably requested by a Consenting Noteholder in order for the Consenting Holders to comply with any applicable tax filing obligation(s) related to the Transaction;

(d)     (A) except as required to consummate the Strategic Change, (i) conduct the business (including the operation thereof) in the ordinary course of business, consistent with past practice, (ii) use commercially reasonable efforts to preserve its goodwill and present business

relationships, including customers, vendors, and employees, and (iii) use commercially reasonable efforts to preserve and maintain its present properties and its tangible and intangible assets; and (B) not, other than in the ordinary course of its business, consistent with past practice, (i) acquire or dispose of any material asset, (ii) incur any material debt or liens, and (iii) take any other action outside of the ordinary course of business other than (x) with the prior written consent of the Requisite Senior Secured Noteholders, (y) as expressly contemplated by this Agreement, or (z) as required to consummate the Strategic Change;

(e)      act in good faith consistent with this Agreement;

(f)      subject to Section 4.02 and Section 23 hereof, not directly or indirectly take any action that would be inconsistent with this Agreement or interfere with the Transaction in any respect;

(g)      deliver a Variance Report to the Consenting Holders not later than three (3) Business Days after the end of each calendar week beginning on the date of this Agreement and continuing until the consummation of a Consensual Transaction; and

(h)      deliver to the Consenting Holders (either directly or via counsel) in connection with the Bankruptcy Case (as defined in the Implementation Steps Memo) (i) all financial reports, budgets, and forecasts delivered by the Issuer to any official committee of unsecured creditors appointed in the Bankruptcy Case or to the United States Trustee; (ii) to the extent reasonably feasible, copies of all proposed pleadings and other papers to be filed by the Issuer with the Bankruptcy Court (as defined in the Implementation Steps Memo), at least 24 hours in advance of such filing; (iii) copies of all pleadings and other papers filed by the Debtors with the Bankruptcy Court, promptly upon such filing; and (iv) copies of any and all other financial or other information or documentation that is reasonably requested by any of the Consenting Holders.

(i)      use commercially reasonable efforts to cooperate, and to cause its direct and indirect subsidiaries to cooperate, with a designee of Newco (the "Designee"), subject to entry of the Designee into a customary nondisclosure agreement with the Company:

(i)      to provide the Designee, upon reasonable prior notice to the Company, access to (a) the corporate, financial, and similar records, reports, and documents or other reasonably requested information of the Company, and to permit Designee to examine such documents and make copies thereof and (b) the Company's officers, senior employees, and public accountants, and to afford Designee the opportunity to discuss and advise on the affairs, finances, and accounts of the Company with their officers, senior management, and public accountants (and, subject to any access letters or other requirements imposed by such accountants, to authorize such accountants to discuss with the Designee such affairs, finances, and accounts); and

(ii)      with respect to the production of cash flow forecasts, business models, and any Variance Report.

Section 4.02 Additional Provisions.   Notwithstanding anything to the contrary in this Agreement:

(a)      nothing in this Agreement shall require the Company or the board of directors or similar governing body of the Issuer or a Company entity to take any action or to refrain from taking any action with respect to the Transaction to the extent it determines in good faith, upon the written advice of outside counsel, that the taking or failing to take such action would be inconsistent with applicable Law or, until the consummation of a Consensual Transaction, breach its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 4.02 shall not be deemed to constitute a breach of this Agreement other than for purposes of determining whether a Creditor Termination Event has occurred that would entitle the Requisite Consenting Noteholders to terminate this Agreement pursuant to Section 5.02(b) or Section 5.02(d) hereof;

(b)      each Company entity and its directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (i) consider, respond to, discuss and negotiate alternatives to the Transaction; and (ii) provide access to non-public information concerning any Company entity to any person that enters into a reasonable and customary confidentiality agreement or nondisclosure agreement with any Company entity, provided that the Issuer shall promptly inform the Consenting Holders of the details and terms of any such alternative transaction, including without limitation, by providing a written copy of such alternative transaction;

(c)      nothing in this Agreement shall prevent the Issuer from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or

(d)      until the consummation of a Consensual Transaction, nothing in this Agreement shall abrogate the rights, power, or duties of the Company (acting through the respective directors, managers and officers of each Company entity) to make independent business decisions in the exercise of their fiduciary duties; provided, however, that nothing in this Section 4.02(d) shall affect the obligations of the Issuer pursuant to Section 4.01(d) hereof.

**SECTION 5.      Termination of Agreement.**

Section 5.01 Generally.  This Agreement (a) will automatically terminate upon the Closing Date, and (b) will automatically terminate upon the occurrence of any Creditor Termination Event (as defined below), and (c) will terminate, as to the Issuer, upon notice to the other Parties at any time after the occurrence and continuation of any Issuer Termination Event (as defined below); provided, however, that this Agreement may not be terminated if the occurrence of the Creditor Termination Event was the direct or indirect result of the actions, omissions or inaction of a majority of the Consenting Holders.  Unless expressly stated otherwise, each of the dates in this Section 5 and in the definition of "Milestones" set forth in this Agreement, may be extended or waived by mutual agreement (which may be evidenced by e-mail confirmation) among the Issuer and (i) Consenting Senior Secured Noteholders holding, in the aggregate, a majority of the Senior Secured Notes held by all Consenting Senior Secured Noteholders as of the date of such extension or waiver and (ii) Consenting Convertible Noteholders holding, in the aggregate, a majority of the Convertible Notes held by all Consenting Convertible Noteholders as of the date of such extension or waiver.

Section 5.02 A "<u>Creditor Termination Event</u>" shall mean any of the following events:

(a)      A Consensual Transaction has not been consummated by 11:59 p.m. (Eastern Time) on May 1, 2023 (the "<u>Outside Date</u>" and, such non-occurrence, an "<u>Outside Date Termination Event</u>");

(b)      the material breach by the Issuer of any covenant or obligation contained in this Agreement, including the failure by the Issuer to comply with a direction given by the Requisite Consenting Holders pursuant to Section 4.01(b) of this Agreement, which breach remains uncured for five (5) Business Days after the Issuer is informed by any Consenting Holder of the existence of such breach;

(c)      the representations or warranties made by the Issuer in this Agreement were untrue in any material respect when made or have become untrue in any material respect, which remains untrue for five (5) Business Days after the Issuer receives notice from any Consenting Holder;

(d)      the Issuer proposes or supports an alternative restructuring transaction other than as contemplated by this Agreement (an "<u>Alternative Transaction</u>") or publicly announces its intention to pursue an Alternative Transaction, and does not rescind or withdraw such Alternative Transaction within five (5) Business Days after the Issuer is informed by the Requisite Consenting Holders that the Requisite Consenting Holders do not support such Alternative Transaction;

(e)      the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of the Issuer or any of its subsidiaries or of any substantial part of their property (such appointment or taking possession, a "<u>Liquidation Termination Event</u>");

(f)      the making by the Issuer of or any of its subsidiaries of any general assignment for the benefit of creditors other than as contemplated by the Transaction;

(g)      [reserved];

(h)      the Issuer or any of its subsidiaries (A) files with a court of competent jurisdiction, to the extent in contravention of this Agreement, the Transaction Term Sheet, the Implementation Steps Memo or such other transaction structure or means of implementation agreed to by the Requisite Consenting Holders in their sole discretion, (i) any motion or application seeking authority to sell any material assets outside the ordinary course of business without the prior written consent of the Requisite Consenting Holders, (ii) any motion, application, or adversary proceeding challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of, any liens, security interests, Claims, or Interests arising under the Indentures, (iii) any motion or application for relief from the automatic stay under the Bankruptcy Code or any similar stay under the laws of any jurisdiction to exercise any remedies against the Noteholder First Lien Collateral (as defined in the Senior Secured Notes Indenture), (iv) a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, (v) a resolution for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger), or (vi) any motion or application for the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian

or other similar official for it or for all or substantially all its assets, (B) has a secured party take possession of all or substantially all its assets, (C) causes any event with respect to it which, under the applicable Law of any jurisdiction, has an analogous effect to any of the events specified in the foregoing clauses of this Section 5.02(h), or any petition or request for relief analogous to the events specified in the foregoing clauses of this Section 5.02(h) is made or filed by the Issuer, any of its subsidiaries or any third party, and such petition or request is granted, or (D) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(i)      the Issuer, without the prior written consent of the Requisite Consenting Holders, (i) incurs any indebtedness for borrowed money that is senior or *pari passu* to any of the obligations of the Consenting Holders or (ii) issues any equity;

(j)      the Bankruptcy Court issues an order appointing a chapter 11 trustee;

(k)      the Bankruptcy Court issues an order appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, provided that an examiner appointed solely to review fees and expenses of retained professionals shall not constitute a termination event under this Section 5;

(l)      the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code;

(m)      the dismissal of the Bankruptcy Case other than in connection with step 3.3 of the Implementation Steps Memo or with the consent of the Requisite Consenting Noteholders;

(n)      the foreclosure (or the granting of a deed in lieu of foreclosure or the like) on or uninsured judgments against any assets of the Issuer which have an aggregate value in excess of $250,000 (a "Foreclosure Termination Event");

(o)      the failure to meet any Milestone in the timeframe required by such Milestone (such failure, a "Milestone Termination Event"); and

(p)      any Variance Report indicates that aggregate actual cash disbursements for the period beginning on the date of this Agreement and ending on the date of delivery of such Variance Report exceed 20% of the aggregate budgeted cash disbursements for the same period as set forth in the Approved Budget (a "Variance Termination Event").

Section 5.03 An "Issuer Termination Event" shall mean any of the following events:

(a)      the Closing has not occurred by 11:59 p.m. (Eastern Time) on the Outside Date;

(b)      the material breach by one or more of the Consenting Holders of any of the representations, warranties, covenants, or other obligations of such Consenting Holder set forth in this Agreement (including the representations and warranties made by such noteholders being untrue in any material respect when made or will have become untrue in any material respect), which breach remains uncured for five (5) Business Days after the applicable Consenting Noteholder receives notice from the Issuer;

(c)    until the consummation of a Consensual Transaction, the board of directors of the Issuer reasonably determines in good faith upon the written advice of outside counsel that continued performance under this Agreement would breach its fiduciary duties under applicable law; and

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Transaction, and such ruling, judgment or order has not been appealed, reversed, or vacated by the Outside Date.

Section 5.04 Mutual Termination.    This Agreement may be terminated by mutual agreement of the Issuer and the Requisite Consenting Holders upon the receipt of written notice delivered in accordance with Section 19 hereof.

Section 5.05 Effect of Termination.  Upon the termination of this Agreement in accordance with Section 5 hereof, this Agreement will forthwith become void and of no further force or effect and each Party will, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and will have all the rights and remedies that it would have had absent this Agreement and will be entitled to take all actions, whether with respect to the Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable Law and, solely to the extent not released pursuant to consummation of a Consensual Transaction, all rights and remedies available to it under the Senior Secured Notes Indenture, the Convertible Notes Indenture, and any ancillary documents or agreements thereto; provided that in no event will any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.    Upon any termination of this Agreement, other than in connection with the occurrence of the Closing, each Consenting Holder will be deemed to have automatically revoked and withdrawn its participation in and consent with respect to the Transaction, without any further action and irrespective of the expiration or availability of any "withdrawal period" or similar restriction, whereupon any consents will be deemed, for all purposes, to be null and void *ab initio* and will not be considered or otherwise used in any manner by the Parties in connection with the Transaction and this Agreement, and the Issuer agrees not to accept any such consents and to take all action necessary or reasonably required to allow the Consenting Holders to arrange with their custodian and brokers to effectuate the withdrawal of such consents, including the reopening or extension of any withdrawal or similar periods.

Section 5.06 Settlement.    This Agreement and the Definitive Documents are part of a proposed settlement of a dispute among certain of the Parties.  If the Closing does not occur and the Agreement is terminated according to and pursuant to this Section 5, nothing herein will be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to United States Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**SECTION 6.     Additional Documents.**

Section 6.01 Cooperation. Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting, and execution and delivery of the Definitive Documents consistent with the Transaction Term Sheet and either the Implementation Steps Memo or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion.

**SECTION 7.     Representations and Warranties.**

Section 7.01 Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof and solely as to itself and, where applicable, its Related Fund:

(a)     such Party and, where applicable, its Related Fund, is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)     assuming the Consenting Holders consent to the transactions contemplated in this Agreement, the execution, delivery and performance by such Party and, where applicable, its Related Fund, of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) in the case of the Consenting Holders and, where applicable, its Related Fund, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, and (iii) in the case of the Issuer, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it or any of its subsidiaries is a party;

(c)     except as set forth in the Implementation Steps Memo or such other transaction structure or means of implementation or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion, the execution, delivery and performance by such Party and, where applicable, its Related Fund, of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)     this Agreement is the legally valid and binding obligation of such Party and, where applicable, its Related Fund, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 7.02 Each Consenting Holder severally (and not jointly), represents and warrants to the other Parties that, as of the date hereof, such Consenting Holder (a) is not a Qualified Marketmaker with respect to the Senior Secured Notes or Convertible Notes set forth below its name on the signature page, (b) (i) is the beneficial owner of the Senior Secured Notes or Convertible Notes set forth below its name on the signature page (which amount, for the avoidance of doubt, are expressed exclusive of any such notes reflecting pay-in-kind interest due and payable in respect of the October 15, 2022 interest payment date and the November 15, 2022 interest payment date, respectively, thereon) or (ii) has, with respect to the beneficial owners of such Senior Secured Notes or Convertible Notes (x) sole investment or voting discretion with respect to such Senior Secured Notes or Convertible Notes, (y) full power and authority to vote on and consent to matters concerning such Senior Secured Notes or Convertible Notes to exchange, assign, or transfer such Senior Secured Notes or Convertible Notes, and (z) full power and authority to bind or act on the behalf of, such beneficial owners.

Section 7.03 The Issuer represents and warrants to the other Parties that, as of their respective filing or furnishing dates, the SEC Documents complied in all material respects with the requirements of the Securities Act and/or the Exchange Act, as the case may be, and the rules and regulations of the SEC promulgated thereunder, as applicable, to the respective SEC Documents.  None of the SEC Documents, at the time they were filed or furnished, nor any of the representations set forth in this Section 7.03, as qualified thereby, contained or contain (as applicable) any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein or herein, in the light of the circumstances under which they were made, not misleading.

**SECTION 8.     Disclosure; Publicity.**

Section 8.01 Not later than the open of business on the Business Day that is four Business Days after the Support Effective Date, the Issuer will file one of more Current Reports on Form 8-K with the SEC describing the existence of this Agreement and the terms hereof, including the terms of the transactions contemplated thereby.  If the Issuer fails to make the foregoing disclosures in compliance with the terms specified herein, any Consenting Holder may publicly disclose the foregoing, including this Agreement, and all of its exhibits and schedules (subject to the redactions called for by this Section 8 hereof), and the Issuer hereby waives any claims against the Consenting Holder arising as a result of such disclosure by a Consenting Holder in compliance with this Agreement.  Any such disclosure shall not disclose the identity of the Consenting Noteholders.

Section 8.02 The Issuer will use commercially reasonable efforts to submit drafts to Ropes and Pillsbury of any documents that constitute disclosure of the existence or terms of this Agreement or the transactions contemplated therein or any amendment to the terms of this Agreement at least two Business Days before making any such disclosure (if practicable, and if two Business Days before is not practicable, then as soon as practicable but in no event less than 24 hours before making any such disclosure), and will afford them a reasonable opportunity to comment on such documents and disclosures and will incorporate any such reasonable comments in good faith.  Except as required by law or otherwise permitted under the terms of any other agreement between the Issuer and any Consenting Holder, no Party or its advisors will disclose to any person (including, for the avoidance of doubt, any other Consenting Holder), other than advisors to the Issuer, the principal amount or percentage of any Senior Secured Notes, Convertible

Notes, or any other securities of the Issuer held by any Consenting Holder, in each case, without such Consenting Holder's prior written consent; provided that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party will afford the relevant Consenting Holder a reasonable opportunity to review and comment in advance of such disclosure and will take all reasonable measures to limit such disclosure, in each case to the extent permitted by law, and (b) the foregoing will not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Senior Secured Notes and Convertible Notes held by all the Consenting Holders collectively.  Notwithstanding the provisions in this Section 8, any Party hereto may disclose, if consented to in writing by a Consenting Holder, such Consenting Holder's individual holdings.

**SECTION 9.    Amendments and Waivers.**

Except as otherwise expressly set forth herein, (a) the Issuer may waive, modify, amend or supplement any of the Definitive Documents in a manner that is technical or conforming in nature without the consent of any Consenting Holder, (b) this Agreement, the form of Joinder Agreement, the Transaction Term Sheet, the Implementation Steps Memo, or any form of or term sheet for a Definitive Document may not be waived, modified, amended or supplemented except in a writing signed by the Issuer and the Requisite Consenting Holders; and (c) any other change, modification, or amendment to the economic terms of the Transaction Term Sheet, the Implementation Steps Memo, or such other transaction structure or means of implementation or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion, that have a material and adverse effect on any Consenting Noteholder may not be made without the written consent of the Issuer and each Consenting Holder.  No waiver, modification, amendment, or supplement to this Agreement, including any exhibits hereto, that is disproportionately adverse to any Consenting Holder as compared to similarly situated Consenting Holders shall be binding upon such Consenting Holder unless such Consenting Holder has consented in writing to such waiver, modification, amendment or supplement.  Notwithstanding the foregoing, Schedule 1 to the Transaction Term Sheet may be updated to allocate or reallocate commitment amounts thereunder as between Consenting Holders in connection with (i) any Joinder Agreement, (ii) any Transfer of Senior Secured Notes or Convertible Notes, or (iii) otherwise, in each case with the consent of only the Consenting Holders affected by such allocation or reallocation.

**SECTION 10.    Effectiveness.**

This Agreement will become effective and binding on (a) the Issuer and the Initial Consenting Holders on the date of the Support Effective Date and (b) any Subsequent Consenting Holder upon delivery of a validly completed Joinder Agreement and of a signed acknowledgement from the Issuer to the other Parties; provided that signature pages executed by Consenting Holders will be delivered to (x) other Consenting Holders in a redacted form that removes such Consenting Holder's holdings of the Senior Secured Notes or Convertible Notes, and (y) the Issuer, Paul Hastings, Ropes and Pillsbury in an unredacted form.

**SECTION 11.   GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE TRANSACTION TERM SHEET OR THE IMPLEMENTATION STEPS MEMO, THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**SECTION 12.   Specific Performance/Remedies; Remedies Cumulative; Reimbursement of Expenses.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to specific performance and injunctive or other equitable relief (including attorneys fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  At (a) the consummation of a Consensual Transaction and (b) the Closing, the Issuer agrees to pay all reasonable and documented fees and expenses of Ropes and its local counsel incurred in connection with the representation of the Initial Consenting Holders prior to the date hereof and through and including the Closing Date, including, without limitation, all reasonable and documented fees and expenses of Ropes incurred in connection with the negotiation of this Agreement, in accordance with the Transaction Term Sheet.

**SECTION 13.   Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, Sections 5.05, 8, and 11–21 will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement will survive such termination.

**SECTION 14.   Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**SECTION 15.   Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

**SECTION 16.   No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other person or entity will be a third-party beneficiary hereof.

**SECTION 17.   Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements heretofore executed between the Issuer and any Consenting Holder (or any advisor thereto) will continue in full force and effect in accordance with the terms thereof.  For the avoidance of doubt, this Agreement supersedes the Commitment Letter, dated as of November 9, 2022, by and among the Issuer and certain of the Consenting Holders (the "Commitment Letter"), and the Parties acknowledge and agree that the Commitment Letter shall hereby be deemed terminated and all obligations thereunder extinguished automatically and without the need for any action by the parties thereto.

**SECTION 18.   Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, which will be deemed to be an original for the purposes of this paragraph.

**SECTION 19.   Notices.**

All notices hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

(1)   If to the Issuer, to:

Quotient Limited
PO Box 1075—JTC House
28 Esplanade, St Helier
Jersey JE4 2QP
Channel Islands
Attention:  Manuel O. Méndez

with a copy (which will not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, New York 10166
Attention:  Matthew Murphy, Esq. (mattmurphy@paulhastings.com)
          Christopher Guhin, Esq. (chrisguhin@paulhastings.com)

(2)   If to an Initial Consenting Holder, to the addresses or electronic mail addresses set forth below such noteholder's signature, with a copy (which will not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attention: Ryan Preston Dahl, Esq. (ryan.dahl@ropesgray.com)
          Sam Badawi, Esq. (sam.badawi@ropesgray.com)
          Jonathan Gill, Esq. (jonathan.gill@ropesgray.com)

and to:

Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Attention: Joshua D. Morse, Esq. (joshua.morse@pillsburylaw.com)
          John A. Pintarelli, Esq. (john.pintarelli@pillsburylaw.com)

(4)   If to a Subsequent Consenting Holder, to such address as provided by such Subsequent Consenting Holder to the Issuer upon execution of a Joinder Agreement.

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

**SECTION 20.   Reservation of Rights; No Admission.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties (a) to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), (b) purchase, sell, or enter into any transactions in connection with the Senior Secured Notes or Convertible Notes, (c) enforce any right under the Indentures, subject to the terms hereof, (d) consult with other Consenting Holders, other holders of Senior Secured Notes or Convertible Notes, or any other Party regarding the Transaction, or (e) enforce any right, remedy, condition, consent or approval requirement under this Agreement or in any of the Definitive Documents.

**SECTION 21.   Relationship among Parties.**

It is understood and agreed that no Consenting Holder has any duty of trust or confidence in any kind or form with any other Consenting Holder, and, except as expressly provided in this Agreement, there are no commitments between them.  In this regard, it is understood and agreed that any Consenting Holder may acquire Senior Secured Notes, Convertible Notes, or other debt or equity securities of the Issuer without the consent of the Issuer or any other Consenting Holder, subject to applicable securities laws and the terms of this Agreement; provided, that, no Consenting Holder will have any responsibility for any such acquisition to any other entity by virtue of this Agreement.

**SECTION 22.   Representation by Counsel; Adequate Information.**

Section 22.01 Each Consenting Holder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company.  Each Party acknowledges that it has had an opportunity to receive information from the Issuer and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived.  This Agreement is the product of negotiations among the Issuer and the Consenting Holders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

Section 22.02 Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities.  Any such offer will be made only in compliance with all applicable securities Laws and/or other applicable Law.  Although each Party believes this Agreement does not constitute or contain an offering of securities, each Consenting Holder acknowledges, agrees, and represents to the other Parties that it (a) is either an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act or a "qualified institutional

buyer" as such term is defined in Rule 144A of the Securities Act, (b) understands that the securities to be acquired by it pursuant to the Transaction have not been registered under the Securities Act and that such securities are being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Holder's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (c) has such knowledge and experience in financial and business matters that such Consenting Holder is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Transaction and understands and is able to bear any economic risks with such investment.

**SECTION 23.   Fiduciary Duties.**

Notwithstanding any other provision in this Agreement to the contrary, until the consummation of a Consensual Transaction, nothing in this Agreement shall require the Company, nor any board of directors or managers of the Company or any of its direct or indirect subsidiaries, to take or refrain from taking any action pursuant to this Agreement (including, without limitation, terminating this Agreement pursuant to Section 5.03(c) hereof), to the extent the board of directors or managers reasonably determines in good faith, based on the written advice of outside counsel, that taking, or refraining from taking, such action, as applicable, would be a breach of its fiduciary obligations under applicable Law (including, for the avoidance of doubt, to the extent the taking, or refraining from taking, such action, as applicable, would be in violation of applicable law, or the consummation of which would require expenditures in excess of the Issuer's available liquidity), and any such action or inaction pursuant to such exercise of such fiduciary duties shall not be deemed to constitute a breach of this Agreement other than for purposes of determining whether a Creditor Termination Event has occurred that would entitle the Requisite Consenting Noteholders to terminate this Agreement pursuant to Section 5.02(b) or Section 5.02(d). The Company shall promptly (and in any event within two (2) business days following such determination) notify each of the Consenting Holders of any such determination.

**SECTION 24.   Email Consents.**

Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel (identified in Section 19) to the applicable Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

[*Signatures Follow on Next Page*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

QUOTIENT LIMITED

By: _____
Name:  Manuel O. Méndez
Title:    Chief Executive Officer

[Transaction Support Agreement Signature Page]

[Signature Pages On File With Company]

**<u>Table of Exhibits</u>**

| <u>Exhibit</u> | <u>Document</u> |
|:---:|:---:|
| 1 | Form of Joinder Agreement |
| 2 | Specified Noteholders |
| A | Transaction Term Sheet |
| B | Implementation Steps Memo |
| C | Approved Budget |

[Exhibit 1 On File With Company]

[Exhibit 2 On File With Company]

## Exhibit A

**Transaction Term Sheet**

**Quotient Limited**

**TRANSACTION TERM SHEET**

This term sheet ("Term Sheet") sets forth the material terms for the restructuring and related funding transactions (the "Transaction") of, among other things, (i) the obligations under that certain Indenture, dated as of October 14, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Senior Secured Notes Indenture") by and among Quotient Limited, a public limited liability no par value company formed under the laws of Jersey, Channel Islands (the "Issuer" and, together with its direct and indirect subsidiaries, the "Company"), the Guarantors party thereto, and U.S. Bank Trust Company, National Association, as trustee (the "Trustee") and (ii) the obligations under that certain Indenture, dated as of May 26, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Convertible Notes Indenture" and, together with the Senior Secured Notes Indenture, the "Indentures"), by and among the Issuer, the Guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee.  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Senior Secured Notes Indenture or the Convertible Notes Indenture, as applicable, or, if not defined therein, as defined in the Transaction Support Agreement to which this Term Sheet is attached.

| Overview | The Transaction will provide for, among other things: |
|---|---|
| | • A comprehensive restructuring of the Company's capital structure consistent with the terms and conditions of this Term Sheet that provides funding to the Company and restructures the debt obligations under the Indentures. |
| | • The exchange of obligations under the Senior Secured Notes Indenture for new senior secured notes issued by a subsidiary of a Delaware limited partnership (together with its subsidiaries and affiliates, as applicable, "Newco") or, with the consent of the Requisite Senior Secured Holders, new senior secured term loans to a subsidiary of Newco (such notes or term loans, the "New Senior Secured Debt"), coupled with a private placement (the "Secured Debt Private Placement") of common equity interests in Newco (and corresponding membership interests in its general partner ("GP")) to the holders of existing notes under the Senior Secured Notes Indenture, inclusive of a grant of additional common equity interests in Newco (and corresponding membership interests in GP) to participants in the Secured Debt Private Placement, as set forth below. |
| | • The satisfaction of the interest amounts due on November 15, 2022 under the Convertible Notes Indenture pursuant to the transactions set forth in steps 3.1(a) and 3.1(c) of the Implementation Steps Memo, and the extinguishment of the obligations under the Convertible Notes Indenture, coupled with a private placement (the "Convertible Notes Private Placement" and, together with the Secured Debt Private Placement, the "Private Placements") of additional common equity interests in Newco (and corresponding membership interests in GP) to the holders of existing notes under the Convertible Notes Indenture, inclusive of a grant of additional common equity interests in Newco (and corresponding membership interests in GP) to participants in the Convertible Notes Private Placement, as set forth below. |

| | |
|---|---|
| **Implementation:** | The Transaction will be consummated pursuant to a Consensual Transaction in all material respects with the terms and conditions of this Term Sheet and pursuant to the steps set forth in the Implementation Steps Memo or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion.  The effective date of the Transaction (the "<u>Effective Date</u>") will be the date upon which a Consensual Transaction or such other transaction structure or means of implementation, as directed by the Requisite Consenting Holders in their sole discretion, is consummated.  On or prior to the Effective Date, Newco will create a new, wholly owned company (in a jurisdiction chosen by the Requisite Consenting Holders in their sole and absolute discretion) ("**Finance Co**") as its direct subsidiary, which will in turn create a new, wholly owned Jersey company ("**Merger Co**") as its direct subsidiary, and substantially all of the assets of the Issuer will be transferred to Finance Co. |
| **Senior Secured Notes Indenture** | Each noteholder under the Senior Secured Notes Indenture (including, to the extent its commitments are assigned to one of its Related Funds, any such Related Fund, a "<u>Senior Secured Noteholder</u>") agrees to exchange (the "<u>Secured Exchange</u>") (i) its Senior Secured Notes (inclusive of the October 15, 2022 interest payment paid or deemed to be paid thereon in-kind and any accrued but unpaid interest, but other than the Bridge Notes) for New Senior Secured Debt at an implied discount of 20% off of the aggregate total principal amount of $136,904,167 of Senior Secured Notes, resulting in the issuance of $109,523,333.60 of New Senior Secured Debt, and (ii) its Bridge Notes for New Senior Secured Debt at face value, resulting in the issuance of an additional $10,000,000 of New Senior Secured Debt.

The Senior Secured Noteholders will agree to customary restrictions on the transfer of their existing Notes under the Senior Secured Notes Indenture. |
| **Senior Secured Noteholder Private Placement** | On the Effective Date, each Senior Secured Noteholder will purchase (*pro rata* based on such Senior Secured Noteholder's percentage ownership of Senior Secured Notes or as otherwise mutually agreed among the Senior Secured Noteholders, in each case as reflected on the commitment schedule attached hereto as <u>Schedule 1</u>) its committed portion of an aggregate of $13 million in new common equity interests in Newco (and corresponding membership interests in GP) at a discount of 35% to the Agreed Equity Value (as defined below).

In addition, each Senior Secured Noteholder will receive its applicable share (based off its participation percentage in connection with the Senior Secured Noteholder Private Placement) of an aggregate of $20 million in new common equity interests in Newco (and corresponding membership interests in GP) at the Agreed Equity Value.

"<u>Agreed Equity Value</u>" means a total equity value of $50 million. |
| **Convertible Notes Indenture** | Each noteholder under the Convertible Notes Indenture (including, to the extent its commitments are assigned to one of its Related Funds, any such Related Fund, a "<u>Convertible Noteholder</u>" and, together with the Senior Secured Noteholders, the "<u>Noteholders</u>") agrees that the notes under the Convertible Notes Indenture shall be extinguished for no value, other than the purchase right set forth below.

The Convertible Noteholders will agree to customary restrictions on the transfer of their existing Notes under the Convertible Notes Indenture. |

| Convertible Noteholder Private Placement | On the Effective Date, each Convertible Noteholder will purchase (*pro rata* based on such Convertible Noteholder's percentage ownership of Convertible Notes or as otherwise mutually agreed among the Convertible Noteholders, in each case as reflected on the commitment schedule attached hereto as <u>Schedule 1</u>) its committed portion of an aggregate of $28 million in new common equity interests in Newco (and corresponding membership interests in GP) at a discount of 35% to the Agreed Equity Value.<br><br>In addition, each Convertible Noteholder will receive its applicable share (based off its participation percentage in connection with the Convertible Noteholder Private Placement) of an aggregate of $30 million in new common equity interests in Newco (and corresponding membership interests in GP) at the Agreed Equity Value. |
|---|---|
| Existing Equity Interests | All of the equity interests in the Issuer (including without limitation, all series and classes of preferred and/or common stock and any options, warrants or other equity rights) existing prior to the date of the merger contemplated by Steps 6.1-6.6 of the Implementation Steps Memo (the "<u>Merger Date</u>") shall be extinguished, cancelled or otherwise rendered valueless, with no surviving rights following the Merger Date, and with the Issuer becoming a wholly owned subsidiary of Newco on the Merger Date. |
| New Senior Secured Debt | Material terms for the New Senior Secured Debt will include:<br><br>• The New Senior Secured Debt shall be secured by a first lien on substantially the same collateral and assets of Newco and the Guarantors that were subject to liens under the Senior Secured Notes Indenture<br><br>• The New Senior Secured Debt will (i) mature 5 years (or, with the consent of the Requisite Senior Secured Noteholders, 7 years) from the Closing Date and (ii) bear interest at a rate of 12% payable in kind for the first three years (or, with the consent of the Requisite Senior Secured Noteholders, two years) following the Closing Date, and thereafter payable in cash.<br><br>• Newco will be required to make a mandatory offer to repurchase the New Senior Secured Debt with 100% of the net proceeds of a sale of Alba.<br><br>• The mandatory offers to purchase, covenants and events of default of the New Senior Secured Debt shall be substantially the same as those under the Senior Secured Notes Indenture.<br><br>• The New Senior Secured Debt shall be redeemable at a price of 103% of the principal amount thereof, plus accrued and unpaid interest, until the second anniversary of the Closing date, and at par (plus accrued and unpaid interest) thereafter. |
| Royalty Rights | All existing Royalty Rights and Royalty Right Agreements (each as defined in the purchase agreements, dated as of October 14, 2016 and January 15, 2019, by and between the Company and the noteholders party thereto) shall remain in effect with adjustments to their terms to address the Strategic Change, including to add the receipt of royalty payments on the MosaiQ product, and otherwise in accordance with their terms, and the Company's obligations thereunder shall be transferred or novated together with, and in connection with the transfer of, the Issuer's assets and |

| | |
|---|---|
| | liabilities to Finance Co pursuant to the Implementation Steps Memo and as described therein, subject to further changes as directed by the Requisite Senior Secured Noteholders and the Issuer to effectuate the foregoing, and the Company agrees not to take any action to the contrary. |
| **General Unsecured Claims** | Other than as specified herein, all other existing general unsecured indebtedness or other claims against the Company shall be unimpaired and assigned to Newco pursuant to the transactions contemplated by the Implementation Steps Memo. |
| **Restructuring Expenses:** | On the Effective Date, Newco agrees to pay the reasonable and documented out-of-pocket fees, costs and expenses of Ropes and its local counsel, as well as any other reasonable and documented out-of-pocket fees, costs and expenses incurred by the Company and the Trustee (collectively, the "Transaction Expenses"). |
| **Tax Structure:** | To the extent reasonably practicable, the Transaction contemplated by this Term Sheet will be structured in a manner reasonably acceptable to the Requisite Consenting Holders and the Company, which (a) minimizes any cash taxes payable as a result of the consummation of the Transaction, (b) maximizes the favorable tax attributes (including tax basis) of Newco and its prospective subsidiaries going forward and (c) otherwise achieves such tax-planning outcomes as reasonably requested by the Consenting Holders or the Company. |
| **Liquidity** | The Requisite Senior Secured Noteholders shall fund, in each case as reflected on the commitment schedule attached hereto as Schedule 1, their commitment portion of $10 million United States dollars of indebtedness to the Company (the "Bridge Notes"), not later than December 20, 2022, which funding shall be in the form of additional notes issued under the Senior Secured Notes Indenture and having the same terms as the notes currently outstanding thereunder (except that the Bridge Notes shall, to the extent the requisite consent shall have been received, have priority in right of payment over the notes currently outstanding under the Senior Secured Notes Indenture). For the avoidance of doubt, the funding of the Bridge Notes shall be in lieu of, and will replace, any commitments or obligations under the Commitment Letter. |
| **Management Incentive Plan:** | On the Effective Date, Newco shall implement a management incentive plan (the "Management Incentive Plan") under which an agreed upon percentage of the equity interests in Newco and/or a subsidiary that are issued and outstanding on the Effective Date will be reserved for issuance as awards.  For the avoidance of doubt, the equity interests reserved for issuance under the Management Incentive Plan shall not be subject to dilution on account of equity issued on account of the Private Placements.  The terms of and initial awards under the Management Incentive Plan shall be determined by the management of the Issuer, the board of Directors of Newco, and the Requisite Consenting Holders on or before the Effective Date. |
| **Definitive Documents:** | This Term Sheet shall be subject to the execution of definitive documents, which documents shall contain terms, conditions, representations, warranties, and covenants customary for the transactions described herein and shall be substantially consistent with the terms of this Term Sheet and in form and substance mutually agreed to by the Issuer and the Requisite Consenting Holders. |

| | |
|---|---|
| **Newco Governance:** | The organizational documents of Newco (and any other documents or agreements related thereto) shall be in form and substance as determined by, and shall incorporate such shareholder rights as agreed to by, the Requisite Consenting Holders in their sole discretion, and shall otherwise be in form and substance reasonably acceptable to the Issuer. |
| **Existing Compensation and Benefit Plans:** | Except as described below, the Noteholders consent to and shall support the approval and assumption/assignment of the Company's written contracts, agreements, policies, programs, and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance.<br><br>On or after the Effective Date, each current employee who is currently party to an employment agreement with the Issuer (each, an "Employment Agreement") shall either: (i) have such Employment Agreement assigned to Newco; or (ii) receive a new employment agreement on terms satisfactory to such employee and to the Requisite Consenting Holders. |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.:** | Under the Transaction, to the extent consistent with applicable law, the indemnification obligations for the Issuer's and other Company entities' current and former directors, officers, managers, and employees, and current attorneys, accountants, investment bankers, and other professionals of the Issuer, as applicable, shall remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, in each case so long as such indemnification obligations are set forth in any of: (a) the organizational documents of an entity of Company; (b) an Employment Agreement; or (c) an engagement or retention letter as to professional or advisory services. |
| **Director and Officer Liability Policy:** | On or prior to the Effective Date, the Company will obtain sufficient liability insurance policy coverage reasonably acceptable to the Requisite Consenting Holders for the six-year period following the Effective Date for the benefit of the Issuer's and other Company entities' current and former directors, managers, officers, and employees on terms no less favorable than the Issuer's existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement, in each case as reasonably agreed to by the Issuer and the Requisite Consenting Holders. |
| **Mutual Releases:** | The Definitive Documents shall include and provide customary mutual releases (including third party releases) and exculpation provisions, with customary carve-outs and limitations, in each case, to the fullest extent permitted by law. |
| **Ownership Limitation:** | Notwithstanding anything to the contrary herein, in the Transaction Support Agreement, or in the Implementation Steps Memo, any Noteholder, in its sole discretion, may elect to have any voting securities of Newco (and in any general partner of Newco or entity controlling such general partner) issuable to such Noteholder in connection with the Transaction which would cause such Noteholder to beneficially own at any time in excess of 19.99% of the outstanding voting power |

|  | of Newco (and any general partner of Newco or entity controlling such general partner) to instead be issued in the form of pre-funded warrants of, or non-voting ownership interests in, Newco (and in any general partner of Newco or entity controlling such general partner), in each case exercisable or convertible into voting securities in Newco (and in any general partner of Newco or entity controlling such general partner) upon 61 days' notice, except that any such Noteholder may elect, in its sole discretion, to have such limitation on conversion or exercise be subject to waiver upon the occurrence of certain change of control, company sale or similar events. |

[Schedule 1 On File With Company]

## Exhibit B

**Implementation Steps Memo**

**Quotient Limited**

## IMPLEMENTATION STEPS MEMO

This Implementation Steps Memo ("**Implementation Steps Memo**") sets forth the material steps for implementing the restructuring and related funding transactions contemplated by the Transaction Support Agreement (the "**TSA**") to which this Implementation Steps Memo is attached.  Notwithstanding anything contained in this Implementation Steps Memo, the Transaction may be implemented through such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the TSA or, if not defined therein, as defined in the Transaction Term Sheet (as defined in the TSA).

## 1      INTRODUCTION

1.1    Quotient Limited ("**Issuer Co**") is a company incorporated in Jersey. It is the issuer of the existing $132,916,667 (exclusive of any pay-in-kind interest payments due and payable in respect of the October 15, 2022 interest payment thereon) of Senior Secured Notes (the "**Secured Notes**") and $105 million of Convertible Notes (the "**Convertible Notes**" and with the Secured Notes, the "**Notes**").

## 2      INCORPORATION OF NEWCO

2.1    The Secured Noteholders will create a Delaware limited partnership ("**Newco**") and a Delaware limited liability company ("**GP**"), in each case owned by the Secured Noteholders pro rata to their ownership of the Secured Notes (or as otherwise agreed by the Secured Noteholders), such ownership interests (the "**Initial Equity**") subject to forfeiture in connection with the effectuation of Step 3.1.  GP will be the general partner of Newco.  GP will have an operating agreement that vests all governance in a manager ("**Ultimate Manager**"), a third party fiduciary whose sole purpose will be to manage GP and direct GP and Newco to effectuate the structuring steps described herein (or such other transaction structure or means of implementation as directed by the Requisite Consenting Holders in their sole discretion), with Ultimate Manager subject to supervision by the members of GP, acting by majority vote.

2.2    Newco will create a new, wholly owned company (in a jurisdiction chosen by the Requisite Consenting Holders in their sole and absolute discretion) ("**Finance Co**") as its direct subsidiary, which will in turn create a new, wholly owned Jersey company ("**Merger Co**") as its direct subsidiary.

2.3    Issuer Co's ordinary shares shall be delisted from Nasdaq and deregistered under Section 12 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), as soon as possible, with a suspension of Issuer Co periodic reporting obligations under Section 15(d) of the Exchange Act to be effectuated as soon as permissible under Exchange Act rules and regulations.

**3**      **CONSENSUAL TRANSACTION**

3.1      Issuer Co and all of the holders of the Secured Notes (the "**Secured Noteholders**") and all of the holders of the Convertible Notes (the "**Convertible Noteholders**") will agree to the following:

(a)      the Convertible Noteholders will agree to the payment in kind of the November 2022 interest payment due in respect of the Convertible Notes, and, in exchange for the issue of certain rights to acquire limited partnership interests of Newco in (n) below, transfer debt due under the Convertible Notes in an amount equal to such interest payment ("**Convertible Notes Transferred Principal**") to Newco;

(b)      Newco will contribute the rights under the Convertible Notes Transferred Principal to Finance Co to subscribe for common equity interests in Finance Co, and in turn Finance Co will contribute part of the Convertible Notes Transferred Principal to Merger Co to subscribe for common equity interests in Merger Co;

(c)      Merger Co and Finance Co will agree to, in exchange for the issuance of preference shares in Issuer Co, transfer the Convertible Notes Transferred Principal to Issuer Co, at which point the Convertible Notes Transferred Principal will be cancelled and extinguished;

(d)      the Secured Noteholders will agree to, in exchange for a limited partner interest in Newco subject to forfeiture to the extent such Secured Noteholder does not subscribe for a limited partner interest in Newco noted in (m) below and the rights to receive Finance Co Notes noted in (j) below in respect of such Secured Notes in connection with the BTA, transfer the debt due under or in respect of the Secured Notes, and all related claims against Issuer Co and its subsidiaries, as issuer and guarantors, respectively, to Newco (the "**Secured Notes Receivable**");

(e)      the Convertible Noteholders will agree to, in exchange for a limited partner interest in Newco subject to forfeiture to the extent such Convertible Noteholder does not subscribe for a limited partner interest in Newco noted in (n) below, transfer the debt due under or in respect of the Convertible Notes, and all related claims against Issuer Co and its subsidiaries, as issuer and guarantors, respectively, to Newco (the "**Convertible Notes Receivable**");

(f)      Newco will contribute part of the right to receive the Secured Notes Receivable to Finance Co to subscribe for common equity interests in Finance Co, and in turn Finance Co will contribute such part of the Secured Notes Receivable to Merger Co to subscribe for common equity interests in Merger Co;

(g)      Merger Co will forgive the Secured Notes Receivable it holds to subscribe for the issuance of ordinary shares in Issuer Co;

(h)      Issuer Co will enter into a business and asset transfer agreement (the "**BTA**") between Issuer Co, Newco and Finance Co under which Issuer Co will:

(i)        transfer all of the shares of its subsidiaries to Finance Co;

(ii)      transfer all of its other assets to Finance Co other than shares and/or interest (directly or indirectly) held in Credit Suisse Virtuoso SICAV-SIF and any and all of its claims and legal remedies arising out of or in connection with the Issuer Co's investment in the Credit Suisse (Lux) Supply Chain Finance Fund, regardless of their nature (civil, criminal or administrative) (the "**Greensill Claims**") but under the BTA Issuer Co will commit to transfer to Finance Co the proceeds of the Greensill Claims and give Finance Co the right to instruct Issuer Co with respect to the conduct of such claims (where the transfer of any asset requires the consent of a third party, Issuer Co will undertake to use its best efforts to obtain that consent); and

(iii)     novate or otherwise assign all its liabilities (including all existing Royalty Rights and Royalty Right Agreements (each as defined in the purchase agreements, dated as of October 14, 2016 and January 15, 2019, by and between Issuer Co and the noteholders party thereto) other than those to or in respect of Newco, in each case to Finance Co (where the novation or assignment of any liability requires the consent of a third party, Issuer Co will undertake to use its best efforts to obtain that consent and until such time as that consent is obtained Finance Co shall indemnify Issuer Co in respect of such liability);

(i)        In connection with the BTA, (A) Issuer Co will receive not more than 49% of Finance Co equity interests and $119,523,333.60 of new secured notes or new senior secured term loans from Finance Co to Issuer Co ("**Finance Co Notes**") and (B) Newco will forgive a portion of the Secured Notes Receivable and the Convertible Notes Receivable and will receive from Issuer Co in respect thereof all Finance Co equity interests and Finance Co Notes it received as described in clause (A), such that Newco will own such Finance Co equity interests and Finance Co Notes in accordance with the paragraph headed "Senior Secured Notes Indenture" in the Transaction Term Sheet.

(j)        Newco will distribute the Finance Co Notes to the Secured Noteholders in respect of their respective Newco limited partner interests such that the Secured Noteholders will be holders of the Finance Co Notes in accordance with the paragraph headed "Senior Secured Notes Indenture" in the Transaction Term Sheet.

(k)      Newco will contribute the remaining portion of the Secured Notes Receivable and the Convertible Notes Receivable to Finance Co to subscribe for common equity interests in Finance Co, and in turn Finance Co will transfer all of the Convertible Notes Receivable and all but a $1,000,000.00 retained debt claim of the Secured Notes Receivable (such retained debt claim, the "**Retained Debt**") to Issuer Co in exchange for new common equity interests in Issuer Co representing a very substantial majority of all of the ordinary issued interests in Issuer Co, at which point the Convertible Notes Receivable and the Secured Notes Receivable (other than the Retained Debt) will be cancelled and extinguished;

(l)     [Reserved];

(m)    the Secured Noteholders will contribute $13 million to Newco in respect of their respective limited partner interests in Newco (and corresponding membership interests in GP) as contemplated by the paragraph headed "Senior Secured Noteholder Private Placement" in the Transaction Term Sheet;

(n)    the Convertible Noteholders will contribute $28 million to Newco in respect of their respective limited partner interests in Newco (and corresponding membership interests in GP) as contemplated by the paragraph headed "Convertible Noteholder Private Placement" in the Transaction Term Sheet; and

(o)    the Secured Noteholders and the Convertible Noteholders will receive their proportionate amounts of $20 million and $30 million, respectively, of Newco's partnership interests (and corresponding membership interests in GP) corresponding to their participation in the Senior Secured Noteholder Private Placement and Convertible Noteholder Private Placement, respectively. Following the transactions in Step 3.1, the Secured Noteholders and the Convertible Noteholders will collectively own 100% of the outstanding equity interests of Newco and the membership interests in GP in accordance with the Term Sheet, and Ultimate Manager shall be removed, with members of GP installing a board of managers to manage GP, as agreed among such members.

3.2    Issuer Co will file a petition for relief in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") along with motions seeking customary first day relief thereby commencing a case under chapter 11 of the Bankruptcy Code (as defined in the TSA) (the "**Bankruptcy Case**") in order to effectuate a plan of reorganization, which shall be acceptable in all respects to the Requisite Consenting Holders (as defined in the TSA) in their sole and absolute discretion and that implements the fully consensual restructuring contemplated by Step 3.1 (the "**Plan**"). The transactions in subsections (d)-(o) of Step 3.1 will only occur when the Plan becomes effective after the Bankruptcy Court enters an order confirming the Plan, which shall be acceptable in all respects to the Requisite Consenting Holders (the "**Confirmation Order**") and shall waive the stay provided under Rule 3020(e) of the United States Federal Rules of Bankruptcy Procedure and become a final order, and such transactions in subsections (d)-(o) of Step 3.1 shall be consummated substantially contemporaneously on the effective date of the Plan.

3.3    If, after consultation with Issuer Co, the Requisite Consenting Holders provide written notice to Issuer Co documenting their reasonable belief that the Confirmation Order is unlikely to be entered on a timely basis by the Bankruptcy Court, either due to failure of the Bankruptcy Court to enter the Confirmation Order on or before February 17, 2023, such Confirmation Order being entered and then either stayed or becoming subject to appeal, or otherwise, then Issuer Co shall immediately seek dismissal of the Bankruptcy Case and, upon such dismissal, unless otherwise instructed by the Requisite Consenting Holders, thereafter shall make any appropriate or necessary filings with the United States Securities and Exchange Commission in connection with the implementation of the Transaction,

including as applicable, with respect to Rule 13e-3 and Rule 13e-4 under the Exchange Act, and upon effectiveness of any approvals obtained as a result of such filings with the United States Securities and Exchange Commission, the transactions in subsections (d)-(o) of Step 3.1 shall be consummated substantially contemporaneously on the effective date of such approval(s).

## 4      MERGER TRANSACTION

4.1     Once the transactions under the Consensual Transaction (as defined in the TSA) are complete, subject to the receipt of any required third party consent, Issuer Co will have no assets or liabilities save for the Greensill Claims (the proceeds thereof the Issuer Co will be obligated to pay over to the Finance Co under the terms of the BTA) and the Retained Debt (the latter to be waived as part of the proposed merger, see next paragraph).

4.2     The majority (at least 2/3rds) of the Issuer Co's ordinary and preference shares will be owned by Finance Co and Merger Co. Finance Co also owns 100% of Merger Co. In order to relieve the shareholders of Issuer Co from any potential liability in its winding up, in consideration of the waiver of the Retained Debt and in consideration of the payment of $0.01 to each member of Issuer Co whose name appears on the register of members of Issuer Co, Issuer Co and Merger Co will enter into a merger agreement (the "**Merger Agreement**") under which Issuer Co merges with Merger Co.  Following the merger Issuer Co will be the surviving and successor entity (unless this is not required to preserve the Greensill Claims in which case Merger Co can be the surviving entity). Under the Merger Agreement and as consideration to the other shareholders of Issuer Co., Finance Co shall forgive the Retained Debt and, as the parent of the merged entity will undertake to hold such other shareholders harmless from Issuer Co's liquidation costs and to manage and pay for the Greensill Claims.

4.3     In order to implement the Merger Agreement, the following Jersey approvals are required (in summary), with other or additional approvals or filings being potentially required depending on the jurisdiction of incorporation of Finance Co and Merger Co:

(a)     approval of Jersey Financial Services Commission;

(b)     directors of Issuer Co solvency statements;

(c)     shareholder of Issuer Co meetings to vote on resolutions to approve the Merger Agreement for both the ordinary shares (controlled by Finance Co and Merger Co) and the preference shares (controlled by Finance Co and Merger Co); and

(d)     creditor notices sent to known creditors of Issuer Co for over £5,000.

4.4     Dissenting shareholders have a 21 day statutory objection period from the date the Merger Agreement is approved by shareholders to apply to a Jersey court on the grounds of unfair prejudice.

4.5     Following completion of the judicial process, the merger will be completed in accordance with the Merger Agreement and the relevant registry entries updated.

[Exhibit C On File With Company]